Lori SHAFRIR, Plaintiff,

v.

ASSOCIATION OF REFORM ZIONISTS OF AMERICA and Union of American Hebrew Congregations, Defendants.

No. 96 Civ. 3161(DC).

United States District Court, S.D. New York.

March 26, 1998.

Tedd Blecher, New York City, for Plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker, by Glen Feinberg, Joseph F. Muratore, New York City, for Defendants.

## *OPINION*

CHIN, District Judge.

Before going on maternity leave, plaintiff in this action purportedly agreed with her employer that she would return to work on a certain date. While she was on maternity leave, her supervisor ordered her back to work nearly a month early, disavowing any agreement on her return date and stating that she was not entitled to any additional time off. Plaintiff did not return to work as ordered by her supervisor and she was fired. She brings this action against her former employer, Association of Reform Zionists of America ("AZRA"), and its affiliate, Union of American Hebrew Congregations ("UAHC"), alleging that they discriminated against her by terminating her employment because of her decision to have a child and continue working. Plaintiff also claims that she and her employer entered into an enforceable

oral contract extending the date she was to return to work and that her employer failed to notify her of the continuation of her health insurance benefits after the termination of her employment.

Defendants move for summary judgment on each of plaintiff's claims. For the reasons stated herein, the motion for summary judgment is denied as to the discrimination claim and granted as to the remaining claims.

## BACKGROUND

### A. *The Facts*

Plaintiff was employed as AZRA's Assistant Director from May 1993 until her dismissal in April 1995. She reported directly to AZRA's Executive Director, Ammiel Hirsch. The parties do not dispute that plaintiff's work performance was satisfactory throughout her employment.

In June 1994, plaintiff notified AZRA that she was pregnant and expected to deliver in January 1995. (Feinberg Aff., Ex. C at 72). At that time, requests by AZRA employees for maternity and paternity leave were to be governed by "the general 'Leave of Absence Policy' of the UAHC and affiliates in effect at the time of the request." (Shafrir Aff., Ex. 3 at 14). When plaintiff's maternity leave began in January 1995, UAHC had a new "Family and Medical Unpaid Leave of Absence Policy" in effect. (See Feinberg Aff., Ex. J effective 11/15/94). This policy granted employees "unpaid leaves of absences up to 12 weeks within a 52 week period...." (*Id.*). Notwithstanding this language, the parties agree that plaintiff was entitled to twelve weeks of maternity leave—6 weeks paid and 6 weeks unpaid. (*See, e.g.,* Feinberg Aff., Ex. 3 at 134; Defs.Rule 56.1 Statement at ¶ 9).

According to plaintiff, in approximately October or November 1994, she discussed her maternity leave with Hirsch. Plaintiff told Hirsch that she was going to spend Passover—from April 15, 1995 to April 23, 1995—in Hawaii with her family. AZRA planned to have a conference in Los Angeles from April

6, 1995 to April 10, 1995. Plaintiff offered to return to work prior to the conference, go to the conference, and then leave from Los Angeles to Hawaii for Passover. Hirsch decided that it did not make sense to have plaintiff go to the conference or to come to work while the office was virtually empty and then leave again for Passover. Thus, according to plaintiff, Hirsch agreed at that time that plaintiff could return to work on May 1, 1995. Hirsch and plaintiff also discussed allowing plaintiff to use accrued vacation and as-yet-accrued vacation for plaintiff's leave beyond the 6 weeks of paid maternity leave. (*See* Shafrir Aff. ¶ 7; Feinberg Aff., Ex. C at 67–70).

Hirsch admits that he knew, before plaintiff went on maternity leave, that she wanted to go to Hawaii. (Feinberg Aff., Ex. D at 173–75). Nonetheless, Hirsch denies that he agreed to allow plaintiff to return to work on May 1, 1995 or that he agreed to advance her vacation time for her trip to Hawaii. (*Id.* at 171–78).[1] According to Hirsch, he and plaintiff discussed when she would return from maternity leave but did not work out the details—they "would be resolved at some time during her maternity leave." (*Id.* at 79). For purposes of this motion, I accept plaintiff's representation that she and Hirsch discussed her maternity leave prior to her departure and that Hirsch orally agreed, at that time, to allow plaintiff to extend her leave until May 1, 1995. The oral understanding was not reduced to writing, and the specific details were presumably going to be ironed out at some point during plaintiff's absence.

Plaintiff alleges that Hirsch made a number of comments that she claims proves his discriminatory animus and intent. For the purpose of this motion, I accept that Hirsch made these comments to plaintiff. In addition to repeatedly asking plaintiff what her plans were and when she would come back to work (Feinberg Aff., Ex. C at 72–75), Hirsch made the following comments to plaintiff prior to her maternity leave:

---

1. When pressed whether he agreed to allow plaintiff to return on May 1, 1995, Hirsch responded, "I do not recall ever telling Lori that

'It's all right. You can return on May 1st.' " (Feinberg Aff., Ex. D at 178).

(1) "How come we can't have a man around here for a change?";

(2) "Everyone is always pregnant";

(3) "What is it with you—there's either miscarriages, D & Cs or pregnancies";

(4) "A woman doesn't need the entire six weeks of maternity leave. Though she is legally entitled to it, she shouldn't take it. My wife didn't take the full six weeks of leave"; and

(5) "Lori, you know things at AZRA are going to be more difficult. There will be programming, more work—can you handle it? You have an obligation to travel—meetings, speaking engagements—will you be able to handle the travelling?" (*See* Shafrir Aff. ¶¶ 6, 9).

Plaintiff gave birth on January 6, 1995 and her maternity leave commenced the following Monday, January 9, 1995.[2] She contends that Hirsch immediately started pestering her to return to work, including making the following comments to her after she gave birth:

(1) "So, we'll see you at the office on Monday?" [comment to plaintiff on day she gave birth]; and

(2) "You like this kind of life—you could live like this, couldn't you? Not working, just having fun, shopping and going to lunch—an easy life." [comment to plaintiff when she visited the office during her maternity leave].

Plaintiff had approximately 11 days accrued vacation when she commenced her maternity leave. After the 6 weeks paid leave expired, she used her accrued vacation. Once her paid leave was exhausted, plaintiff went into an unpaid leave status.

On March 1, 1995, Hirsch sent a memorandum to plaintiff informing her that he expected her to return to work on April 3, 1995 despite the fact that he was "aware of [her] desire to continue [her] maternity leave until May 1." (Feinberg Aff., Ex. F). The memorandum unequivocally notified plaintiff that she did not have approval to "vacation during

April" and that if she did not return to work by April 3, 1995 that Hirsch would not hold her position open for her. (*Id.*). Apparently, plaintiff and Hirsch had several telephone conversations about her return date both before and after the March 1, 1995 memo. Hirsch sent plaintiff another memorandum dated April 4, 1995 informing her that "[i]f I do not hear from you by Friday, April 7 that you will return to full-time work by Monday, April 10, at the latest, I shall consider your decision to cease your employment at AZRA as final, and your employment shall be terminated, effective, April 10, 1995." (Feinberg Aff., Ex. G).

Plaintiff responded to the April 4, 1995 memo by letter dated April 7, 1995. She expressed shock and disbelief at Hirsch's "hard line" because they had agreed that she would be out on maternity leave until May 1, 1995. Plaintiff noted that she relied on Hirsch's promise about the duration of her leave and was not in a position to change her plans. (Shafrir Aff., Ex. 6). Plaintiff came into the office on April 10, 1995 as ordered. She had no intention, however, of returning to full-time work as of that day. She maintained that she was entitled to go to Hawaii as planned and as agreed upon. When plaintiff returned on April 10, 1995, Hirsch was in California.

Plaintiff's employment was terminated effective April 10, 1995. Hirsch notified plaintiff of her discharge in a memorandum dated April 11, 1995. In that memo, Hirsch claimed that "[a]t no time did I ever agree that your maternity leave would extend to May 1." (Feinberg Aff., Ex. K). He also claimed that plaintiff's shock was insincere because plaintiff told him that she would understand if he decided to fire her and that she was no longer committed to her job. (*Id.*).

Hirsch advised AZRA's personnel department on April 12, 1995 that plaintiff was no longer employed by AZRA. (*See* Fern Aff., Ex. A). He also advised that Naomi Schorsch, who had taken on some of plain-

---

**2.** Plaintiff did not work from December 24, 1994 until her baby was born. She used accrued vacation time, however, for this period.

tiff's responsibilities while on maternity leave, was AZRA's new Assistant Director effective April 11, 1995. Schorsch was neither pregnant nor a mother. Fern Glass, AZRA's personnel administrator, verified that she prepared and signed a letter dated April 17, 1995 advising plaintiff of her COBRA rights. The letter was sealed and placed in an envelope addressed to "Lori Shafrir" at her home address. (Fern Reply Aff. ¶ 2). The letter was placed in Glass's "out" box, which is emptied by the mail department several times a day and then placed in an official United States Post Office mailbox. (Fern Aff. ¶ 3).

## B. *Prior Proceedings*

Plaintiff applied for unemployment compensation after her employment was terminated. Defendants objected to plaintiff's application, claiming she voluntarily left her job without good cause. Defendants failed to appear for a hearing and plaintiff was awarded unemployment compensation by default. (Shafrir Aff., Ex. 7). Thereafter, defendants appealed the determination but it was sustained and their objections were overruled. (Shafrir Aff., Ex. 8). Defendants applied for a reopening and reconsideration of the Board's decision, but, once again, the initial determination was affirmed. (Shafrir Aff., Ex. 9).

On or about December 15, 1995, plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission. She received a Notice of Right to Sue dated January 31, 1996 and commenced this action on April 30, 1996. Plaintiff's complaint alleges that defendants "purposefully denied [her] equal terms and conditions of employment because of her sex and/or pregnancy and, on the same basis, terminated her employment" in violation of 42 U.S.C. § 2000e et seq. ("Title VII"). (Compl.¶¶ 1, 2). Plaintiff also alleges causes of action for breach of contract and failure to comply with the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq. ("COBRA"). (Compl.¶ 1).

This motion followed.

## DISCUSSION

### A. *Legal Standards*

#### 1. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. Summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* 475 U.S. at 586. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984)). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249. As the Supreme Court stated in *Anderson*, "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

### 2. *Title VII Standards*

The "ultimate issue" in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that there was discriminatory intent. *Fields v. New York State Office of Mental Retardation and Dev. Disabilities,* 115 F.3d 116, 119 (2d Cir.1997); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc*), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiffs have generally sought to meet that burden by using a "mixed-motives" analysis, *see de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.,* 82 F.3d 16, 23 (2d Cir.1996); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), or by proving "pretext" under the three-part test first enunciated by the Supreme Court in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *de la Cruz,* 82 F.3d at 20.

As articulated in recent years, the three-step *McDonnell–Douglas* test theoretically operates as follows. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who was qualified for her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802; *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997); *Fisher,* 114 F.3d at 1335–36. Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510–11. The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Because the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination. *See Fisher,* 114 F.3d at 1337.

Although the *McDonnell Douglas* framework has been with us for some 25 years, it has proven at times to be confusing and unworkable. For the reasons set forth in my Opinion issued today in *Lapsley v. Columbia University,* 999 F.Supp. 506 (S.D.N.Y.1998), I believe the *McDonnell Douglas* test has outlived its usefulness. It should be discarded and courts instead should focus on the "ultimate issue"—whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an "impermissible," or discriminatory, reason.

In the summary judgment context, a more direct approach would refocus attention on what should be the central inquiry: the evidence, or lack of evidence, of discrimination in a particular case. In considering a summary judgment motion, courts should address the ultimate issue by examining whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason. *See Fisher,* 114 F.3d at 1347. The court should conduct this inquiry in the following manner: first, by evaluating plaintiff's proof, direct or otherwise, of discrimination; second, by evaluating defendant's proof that it did not discriminate, including evidence of defendant's explanations for its decisions; and third, by considering the evidence as a whole, resolving all conflicts in

the proof and drawing all reasonable inferences in favor of the plaintiff.

In considering the ultimate issue, a factfinder at trial or a court considering a motion for summary judgment must bear two concepts in mind. First, the issue is intentional discrimination—the plaintiff has the burden at all times of proving, by a preponderance of the evidence, that she was the victim of intentional discrimination. *See St. Mary's,* 509 U.S. at 507 (stating that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (quoting *Burdine,* 450 U.S. at 253). It is not enough that the plaintiff was unfairly treated or that a defendant's stated reasons for its employment actions are proven to be pretextual. Rather, while unfair treatment and a defendant's false statements may constitute "pieces of circumstantial evidence" that support a claim of intentional discrimination, the evidence as a whole must be sufficient to sustain an "ultimate finding" of intentional discrimination. *Fisher,* 114 F.3d at 1338.

Second, at the same time, proof of intentional discrimination is often elusive. Because an employer's "intent and state of mind are implicated," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), "direct, smoking gun, evidence of discrimination" is rarely available. *Richards v. New York City Board of Education,* 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir.1988). Courts must continue to be mindful that " 'clever men may easily conceal their motivations.' " *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir.1979) (quoting *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)); *accord Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *see also Tyler,* 958 F.2d at 1187 ("[If] there is at the very least a thick cloud of smoke," an employer must "convince the factfinder that, despite the smoke, there is no fire.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). All a plaintiff need do is persuade a finder of fact, from all the evidence in the record, that it is more likely than not that the adverse employment decision was motivated at least in part by an impermissible reason.

### B. *Application*

#### 1. *Discrimination*

■ As Shafrir relies on the *McDonnell Douglas* test and it remains governing law, I am bound to apply it. Rather than do so formalistically, however, I assume that Shafrir has made out a prima facie case. Defendants have articulated legitimate, nondiscriminatory reasons for their actions. Hence, I proceed directly to the ultimate question: whether Shafrir has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by reviewing first Shafrir's evidence, then defendants' evidence, and finally the record as a whole.

#### a. *Plaintiff's Evidence*

Shafrir points to the following evidence that she alleges proves that she was dismissed because she was a woman and had recently given birth to a child: (i) her dismissal; (ii) Hirsch's oral comments; (iii) evidence of pretext; and (iv) the seemingly inexplicable harshness of defendants' decision to fire her.

#### (i) *Plaintiff's Dismissal*

Plaintiff was fired, while she was on maternity leave, after she had purportedly been promised that she could remain on leave until May 1, 1995. She was then replaced by a woman who was neither pregnant nor a mother.

Although these facts by themselves would not be sufficient by any means to sustain a claim of discrimination, they provide some evidence of discrimination to be considered together with all the evidence in the record.

#### (ii) *Hirsch's Oral Comments*

Hirsch's oral comments to plaintiff both before and during her maternity leave could lead a rational factfinder to conclude that Hirsch ordered plaintiff to return to work prior to May 1 knowing she could not com-

ply, and that he did so because he believed that plaintiff's decision to be a mother was not compatible with the responsibilities of her position. *See, e.g., Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (recognizing discrimination based on gender in conjunction with the fact that plaintiff has children).

### (iii) *Pretext*

The record contains evidence from which a jury could find that defendants's stated reasons for dismissing Shafrir were pretextual. Although defendants allege that Hirsch ordered plaintiff back to work on April 3, 1995 and then on April 10, 1995 for reasons unrelated to her maternity status, the circumstances surrounding Hirsch's memoranda to plaintiff and the language he used in those memoranda provide a reasonable basis for a jury to conclude otherwise. For instance, in his March 1, 1995 memo, Hirsch specifically mentioned to plaintiff that "he understand[s her] family concerns. All of us who work and raise families must reconcile the needs of the job and the needs of our families." (Feinberg Aff., Ex. F). In his April 4, 1995 memo, Hirsch states, "Lori, I understand your decision to spend more time with Rachel. Your decision not to return to work after your allotted maternity leave, is for you alone to make." A reasonable jury could find on the basis of these statements, coupled with Hirsch's other comments to plaintiff, that he dismissed her not because she chose to take a vacation but because of his doubts as to her desire and ability to continue working after having a child.

The timing and sequence of plaintiff's dismissal also support a finding of pretext. In a memo to Fern Glass and Paul Rockfeld on April 12, 1995, Hirsch notified them that plaintiff's employment was terminated as of April 11, 1995. In the same memo, Hirsch also announced that he had *already* selected a replacement. Plaintiff was replaced by a colleague who had already been given some of plaintiff's job responsibilities and who was neither pregnant nor a mother. A reasonable jury could conclude therefore that Hirsch had made up his mind to dismiss plaintiff before she made it clear that she

would take her vacation as earlier discussed with Hirsch. Indeed, plaintiff's "contract" with Blue Cross and Blue Shield was cancelled on April 1, 1995—two days before plaintiff was even ordered to return to work by Hirsch. (Shafrir Aff., Ex. 12).

Finally, a jury could find pretext based on the fact that defendants provided "moving target" explanations. They apparently contended during the unemployment compensation proceedings that plaintiff voluntarily left her job. They now acknowledge that she was fired.

### (iv) *The Harshness of Plaintiff's Dismissal*

A reasonable jury could find that defendants' decision to fire plaintiff was irrational, because she had otherwise been an excellent employee and was seeking only a few weeks of additional leave. A reasonable jury could construe defendants' illogical or unduly harsh actions as evidence of discrimination. *See Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 880 n. 6 (2d Cir. 1997). This is particularly so if one assumes that Hirsch had originally told Shafrir that she could stay out on leave until May 1.

In short, plaintiff has presented substantial evidence to support her claims of discrimination.

### b. *Defendants' Evidence*

Defendants present substantial evidence that Hirsch fired Shafrir because she refused to return to work when ordered to in April 1995. As discussed above, however, Shafrir has presented evidence from which a jury could reasonably conclude that Hirsch had determined to fire Shafrir for other reasons and seized upon Shafrir's desire to remain out on leave until May 1, 1995.

Defendants also rely on the fact that plaintiff was replaced by another woman to argue that her discrimination claim must fail. This fact, however, does not bar plaintiff's claim. *See generally O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding that replacement of person by another person in protected class does not defeat age discrimination

claim); *Bratek v. Merck & Co., Inc.,* 91 Civ. 0252E, 1993 WL 124747, *5 (W.D.N.Y. Apr.16, 1993) (hiring a woman to replace woman alleging gender discrimination does not necessarily disprove discrimination).

 Defendants also argue that plaintiff's claim under the Pregnancy Discrimination Act (the "PDA") must fail because she was not pregnant at the time of her discharge. The PDA, however, requires a plaintiff to prove that the employment decision was made "on the basis of pregnancy, *childbirth* or related medical condition." 42 U.S.C. § 2000e(k) (emphasis added). Defendants' claims are unpersuasive. The plain language of the PDA includes "childbirth" as a basis upon which the plaintiff can demonstrate discrimination. Such is the case here. Even though plaintiff was neither pregnant nor ill at the time she was discharged, she had recently given birth and was on maternity leave. Because she claims she was discharged because of childbirth, the PDA is properly invoked.

#### c. *The Record as a Whole*

Considering the evidence as a whole and resolving all conflicts in the evidence and drawing all reasonable inferences in her favor, I conclude that a reasonable jury could find that Shafrir was dismissed at least in part for an impermissible reason.

"Summary judgment should be used sparingly in employment discrimination cases where the employer's intent, motivation, or state of mind are at issue." *LaCoparra v. Pergament Home Centers, Inc.,* 982 F.Supp. 213, 218 (S.D.N.Y.1997). Here, Hirsch's intent and motivation are at issue, and there is a question of fact as to whether his articulated reason for ordering plaintiff back to work prior to May 1, 1995 was legitimate given that he knew plaintiff planned to be away until May 1, 1995, and he agreed (according to plaintiff) to that date prior to her going on maternity leave in January 1995.

Finally, while *St. Mary's* and *Fisher* make it clear that a plaintiff must show not only that a defendant's articulated reasons are pretextual but that they are a pretext for discrimination, here a jury could find, on the basis of Hirsch's alleged comments and all the circumstances of the case, that the pretext was intended to mask his desire to fire plaintiff because of his concerns that she could not devote her full attention to her job because she had become a mother. The evidence is specific enough to satisfy plaintiff's burden of showing circumstances that could lead a reasonable person to infer that the termination of her employment was illegally discriminatory.

Accordingly, defendants' motion for summary judgment on plaintiff's discrimination claim is hereby denied.

#### 2. *Contract*

 Although she acknowledges that she otherwise was an at-will employee, plaintiff claims that the oral assurance from Hirsch to extend her maternity leave to May 1, 1995 constituted an enforceable express limitation on defendants' right to discharge her at will. (Pl. Mem. at 13–16). The employment-at-will doctrine gives "[a]n employer ... a nearly unfettered right to discharge an employee." *Jones v. Dunkirk Radiator Corp.,* 21 F.3d 18, 21 (2d Cir.1994). "Oral assurances alone are insufficient to establish ... an agreement to limit the employer's right to terminate the employee[ ]." *Fitzgibbon v. Sanyo Secs. America, Inc.,* No. 92 Civ. 2818, 1994 WL 281928, *6 (S.D.N.Y. June 22, 1994). Under New York law, at-will employees can be dismissed at any time absent an express agreement otherwise. *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919 (Ct.App. 1987).

 To state a cause of action for breach of employment contract in New York, the otherwise at-will employee must show the existence of circumstances that indicate: "(1) an express limitation on the employer's right to terminate the employment, and (2) reliance upon that limitation." *Munn v. Marine Midland Bank, N.A.,* 960 F.Supp. 632, 641 (W.D.N.Y.1996). The totality of circumstances must be examined in making such a determination including writings (if any), the situation, the course of conduct of the parties, and their objectives. *Id.*

**364**

No rational jury could conclude, based on the totality of circumstances in this case, that defendants expressly limited their right to terminate plaintiff's employment simply because Hirsch agreed to allow plaintiff to extend her maternity leave to May 1, 1995. Indeed, shortly after Hirsch agreed to allow plaintiff to be out until May 1, 1995, plaintiff claims he began pestering her about when she would return. While plaintiff was out on maternity leave, Hirsch contacted her several times to inquire about her return date and, ultimately, ordered her back to work prior to the agreed upon date. While Hirsch's conduct arguably raises an inference of discriminatory animus toward plaintiff, it does not demonstrate that he expressly limited his right to terminate plaintiff's at-will employment. *Fry v. McCall*, 945 F.Supp. 655, 666–67 (S.D.N.Y.1996).

Moreover, as defendants argue, the agreement to extend plaintiff's leave until May 1, 1995 lacks consideration. To maintain her employment status at AZRA, plaintiff was obligated to return to work subsequent to her maternity leave. Promising to return to work, therefore, is not valid consideration for the agreement between plaintiff and Hirsch concerning the May 1, 1995 return date.

Finally, even on plaintiff's version of the facts, no reasonable jury could find reliance. If Hirsch had indeed started pestering plaintiff almost immediately about her return date, as she alleges, she could not very well have relied on what he had purportedly said immediately before. At that early point in time, there was nothing to prevent Hirsch from changing his mind.

In light of the above, no rational jury could conclude that Hirsch's oral assurance concerning plaintiff's return date was a legally enforceable contract that altered her employment-at-will status. Accordingly, plaintiff's contract claim is dismissed with prejudice.

### D. *COBRA*

Plaintiff's claim under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") is also deficient. Pursuant to 29 U.S.C. § 1161 et seq., an employer must offer continuation of health coverage upon the termination of an employment relationship. As set forth in two affidavits by Fern Glass, defendants sent plaintiff a notice offering her the option of purchasing continuation of health coverage. (Glass Aff., Ex. B; Glass Reply Aff.). Plaintiff maintains that she never received the notice. Even assuming that is true, given Glass's affirmations, however, and the absence of any concrete evidence to contradict Glass's statements, no reasonable jury could conclude that defendants failed to fulfill their COBRA obligations. *See Myers v. King's Daughters Clinic*, 912 F.Supp. 233, 236 (W.D.Tex.), *aff'd*, 96 F.3d 1445 (5th Cir. 1996). Accordingly, plaintiff's COBRA claim is dismissed with prejudice.

### *CONCLUSION*

For the reasons stated above, defendants' motion for summary judgment is denied in part and granted in part. The contract and COBRA claims are dismissed. The parties shall appear for a pretrial conference on Friday, April 24, 1998 at 11 a.m.

SO ORDERED.