Ingrid CAMPBELL, Plaintiff,

v.

ALLIANCE NATIONAL INCORPO-RATED, d/b/a Alliance Business Centers, Daria Semkow and Laura Kozel-ouzek, Defendants.

No. 99CIV.318(SAS).

United States District Court, S.D. New York.

July 6, 2000.

York Newspaper Printing Pressman's Union  No. 2, 1992 WL 122788 at *7.

Sheldon Eisenberger, Law Office of Sheldon Eisenberger, New York, NY, for Plaintiff.

Christopher J. Collins, Proskauer Rose LLP, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Ingrid Campbell brings this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, alleging claims of racial discrimination for failure to promote and wrongful termination.[1] Defendants Alliance National Incorporated ("Alliance"), Daria Semkow and Laura Kozelouzek move for summary judgment dismissing the complaint under Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, defendants' motion is granted and the case is dismissed.

## I. Facts

### A. Alliance's Business

Alliance provides short term and long term office space and business support

---

1. Although plaintiff alleges various instances of racial discrimination, *see* Complaint ¶¶ 33, 36, 39, 40, 43, these instances are apparently alleged merely to support plaintiff's wrongful termination claim and do not, in and of themselves, constitute actionable adverse employment actions under Title VII.

services (such as receptionists, secretarial support, and word processing) to business clients through the operation of its "business centers" located throughout the United States. Defendants' Statement Pursuant to Local Rule 56.1 ("Def. R. 56.1 Stmt") ¶ 1. Alliance operates several such business centers in New York City including a center located at 26 Broadway. *Id.* ¶ 2.

During 1997, Daria Semkow was Alliance's Area General Manager responsible for all of Alliance's New York City centers. *Id.* ¶ 3. Semkow reported to Laura Kozelouzek, then Senior Vice President for the Northeast Region. *Id.* Semkow and Kozelouzek maintained their offices in New York City. *Id.* ¶ 4. Lisa Roeck was the Area Operations Manager during this period and, as such, was responsible for training and assisting other Operations Managers.

### B. Campbell's First Employment with Alliance

Campbell began full-time employment with Alliance in September 1990 as a telephone operator at Alliance's 599 Lexington Center. *See* Deposition of Ingrid Campbell ("Campbell Dep."), Ex. 1 to the Affirmation of Christopher Collins, defendants' attorney ("Collins Aff."), at 27–28. In 1995, she was promoted to Communications Supervisor. *Id.* at 35. In January of 1996, Campbell voluntarily resigned her position with Alliance and left to work for a competitor. *Id.* at 60–61. Campbell acknowledged that prior to her resignation, she was never discriminated against because of her race. *Id.* at 65–66.

### C. Alliance's Re–Hiring of Campbell

Campbell became dissatisfied with her new position, *id.* at 75, so she called Kozelouzek and inquired whether there were any job opportunities. *Id.* at 78–79. Kozelouzek advised Campbell that they should stay in touch. *Id.* at 79; *see also* Deposition of Laura Kozelouzek ("Kozel-

ouzek Dep."), Ex. 3 to the Collins Aff., at 122–23.

Shortly thereafter, Kozelouzek contacted Campbell about an Operations Manager position which became available at 26 Broadway. Campbell Dep. at 80–81; Kozelouzek Dep. at 124. After interviewing Campbell, Kozelouzek discussed the possibility of hiring her with Semkow and Roeck. Kozelouzek Dep. at 125; *see also* Deposition of Daria Semkow ("Semkow Dep."), Ex. 2 to the Collins Aff., at 343–44. Although Roeck had some reservations about hiring Campbell, Semkow Dep. at 349, Semkow and Kozelouzek hired Campbell as Operations Manager at the 26 Broadway Center. *Id.* at 343. Campbell's employment as an Operations Manager began on February 3, 1997. *See* Plaintiff's Hiring Letter, dated January 15, 1997, Ex. 3 to the Campbell Dep., Ex. 8 to the Collins Aff. That letter stated that plaintiff was to be paid $33,000 per year with a performance incentive program (bonus) of up to $3,600 per year. *Id.* That letter also stated that Campbell's supervisor of record would be Laura Kozelouzek but that in the future it could be the Area General Manager (Daria Semkow). *Id.*

As Operations Manager, Campbell had overall responsibility for the operations of 26 Broadway including the oversight of all facilities management such as center readiness, renovations, and client and vendor relations. *See* Operations Manager Job Description, Ex. 5 to the Campbell Dep., Ex. 8 to the Collins Aff. Campbell was also responsible for all financial management aspects of the center including billing, processing daily bank deposits, and data collection from Alliance's client telephone usage system (Microcall). *Id.*

### D. Campbell's Performance Problems

Early on, Campbell had difficulties fulfilling her job duties. On May 20, 1997, just over three months after she began as Operations Manager, Campbell received her first 30–day probation for "unsatisfac-

tory judgment and performance." *See* May 20, 1997 Letter to Campbell from Semkow and Roeck, Ex. 11 to the Campbell Dep., Ex. 8 to the Collins Aff. That probation memorandum identified five areas of unacceptable job performance: (1) lost revenue due to Campbell's failure to check the Microcall telephone billing system for accuracy; (2) a lack of urgency when Alliance's "C–Plus" system (a telephone tracking system) was not working; (3) excessive tardiness; (4) failing to account for a cash payment of $1,700 given to a sales coordinator from a client as payment for office space; and (5) lack of sufficient knowledge and performance in the position of Operations Manager. *Id.*

Campbell responded in writing to this probation memorandum and disputed several items including problems with C–Plus, excessive tardiness, and the missing $1,700. *See* Letter from Campbell to Semkow, dated May 20, 1997, Ex. 12 to the Campbell Dep., Ex. 8 to the Collins Aff. In that letter, Campbell took full responsibility for her "lack of judgment and thoroughness in maintaining and supervising the data of Microcall." *Id.* Campbell then provided a litany of problems she encountered at 26 Broadway including personnel changes, security issues, and billing. *Id.* Finally, Campbell conceded that "all of the above mentioned is just cause for my below average performance as the Operations Manager." *Id.*

Campbell's performance problems persisted and on June 20, 1997, her probation was extended for another thirty days. *See* Letter from Semkow to Campbell, dated June 20, 1997, Ex. 13 to the Campbell Dep., Ex. 8 to the Collins Aff. The following four areas of inadequate performance were stated in that memorandum: (1) overall job knowledge and performance was below expectations; (2) failing to conduct regular client satisfaction interviews;

(3) inadequate staff development (including high turnover and low morale); and (4) lack of communication with staff and clients. *Id.*

On July 28, 1997, Campbell's probation was again extended. *See* Letter from Semkow and Roeck to Campbell, dated July 28, 1997, Ex. 15 to the Campbell Dep., Ex. 8 to the Collins Aff. This probation memorandum listed 23 areas in which Campbell's performance needed improvement. These areas included: "Billing & Reports," "Staff Stabilization & Training," "Telecommunications," "Client Relations & Follow Up Procedures," and "Time Management." *Id.* The memorandum also stated that failure to meet consistent, acceptable performance within the next thirty days would result in termination. *Id.*

Campbell's performance problems nevertheless continued and she was again placed on a 30–day probation on October 8, 1997. *See* Letter from Semkow and Kozelouzek to Campbell, dated October 8, 1997, Ex. 17 to the Campbell Dep., Ex. 8 to the Collins Aff. The following four areas of inadequate performance were identified: (1) poor judgment in the hiring of a new word processor; (2) lack of responsiveness in handling an important request from Alliance's Chief Financial Officer; (3) excessive costs with use of the company car service; and (4) lack of judgment in making decisions (failure to recognize when supervisor approval was necessary). *Id.* The letter concluded that failure to improve could result in extension of the probationary period or termination of employment. *Id.*

Based on Campbell's persistent performance deficiencies, Semkow decided to terminate her employment in November of 1997, approximately nine months after she was hired.[2] Semkow Dep. at 724. Semkow's decision was made after she discussed Campbell's ongoing problems with

---

**2.** Plaintiff argues that the probation letters were the result of one hypercritical supervisor—Semkow. However, the May 20 and July 28, 1997 letters were signed by Daria Semkow and Lisa Roeck while the October 8, 1997 letter was signed by Semkow and Laura Kozelouzek.

Kozelouzek and Linda Harris, Alliance's Senior Vice President of Human Resources. *Id.* On November 10, 1997, Semkow and Kozelouzek met with Campbell and advised her that her employment was being terminated. Campbell Dep. at 165. Campbell was given a written Release which provided for severance of one month's salary plus earned but unused vacation time upon its execution. *See* Severance and Release Agreement, Ex. 8 to the Collins Aff. Campbell executed the Release on November 29, 1997 and Alliance sent her the severance payment. Campbell Dep. at 176–77. Campbell commenced this action in January of 1999.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine factual dispute exists rests on the moving party. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In assessing the record to determine whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once the moving party has met its initial burden of production, the non-moving party must come forward with specific facts evidencing a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (internal quotation marks and citations omitted, alteration in original).

Greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue. *See Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999) (citations omitted). This is so because "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir.1999) (internal quotation marks and citation omitted, brackets in original). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110; *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

### B. Release Is Not A Bar To This Action

In return for the severance and vacation pay, Campbell agreed to release Alliance from any claims for wrongful discharge and for discrimination based upon, *inter alia*, Title VII of the Civil Rights Act of 1964. *See* Severance and Release Agreement ("Release"), Ex. 7 to the Campbell Dep., Ex. 8 to the Collins Aff., ¶¶ 2–3. The Release states: "I represent that I have read and understand the foregoing Severance and Release Agreement and that I voluntarily and knowingly intend to be bound by its terms." *Id.* ¶ III. The Release did not, however, inform Campbell that she should consult an attorney nor did Alliance advise her to do so. Kozelouzek Dep. at 205.

"Under Title VII, an employee may validly waive a claim of discrimination so

long as the waiver is made knowingly and willfully." *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 402 (2d Cir. 1989) (internal quotation marks and citations omitted). In determining whether a waiver is knowing and voluntary, the Second Circuit has adopted the "totality of circumstances" test applied by the Third Circuit in *Coventry v. United States Steel Corp.*, 856 F.2d 514, 524 (3d Cir.1988). *See Bormann*, 875 F.2d at 403. Accordingly, the following factors, first enunciated by Judge Morris Lasker in *EEOC v. American Express Publ'g Corp.*, 681 F.Supp. 216, 219 (S.D.N.Y.1988), are relevant in determining voluntariness:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Bormann*, 875 F.2d at 403. The above list is not exhaustive and the absence of a single factor is not necessarily dispositive. *See Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir.1991) (citation omitted).

Here, application of the above factors, while helpful, is not dispositive. The first factor seemingly cuts in favor of finding a knowing and voluntary waiver. Campbell is a high school graduate who has attended college but has not received a degree. *See* Campbell Dep. at 11. Moreover, she held a managerial position at Alliance. This Court has held that "a plaintiff with a high school education and management experience [is] capable of understanding a straightforward release much like the stipulation at issue here." *Prunella v. Carlshire Tenants, Inc.*, 94 F.Supp.2d 512, 516 (S.D.N.Y.2000) (citing *Nicholas v. Nynex,*

*Inc.*, 929 F.Supp. 727, 731 (S.D.N.Y.1996)). The second factor also militates in favor of waiver. Campbell considered the release for almost three weeks before signing it and discussed it with various family members. Campbell Dep. at 169–72, 176. This is a sufficient period of time. *See Glugover v. Coca–Cola Bottling Co. of New York, Inc.*, 91 Civ. 6331, 1993 WL 312269, at *9 (S.D.N.Y. Aug. 12, 1993), *aff'd mem.*, 60 F.3d 810 (2d Cir.1995) (possession of agreement for over two months deemed sufficient). In addition, Campbell was given seven days within which she could revoke the Release after signing it, but she chose not to do so. *See* Release ¶ III. The third factor cuts against a finding of waiver as Campbell had no input as to the terms of the Release. However, the *Bormann* court expressly stated that a trial as to "voluntariness" is not required merely because the plaintiff did not have an opportunity to negotiate the terms of the waiver. 875 F.2d at 403 n. 1. The fourth factor, clarity of the agreement, weighs in favor of waiver. The Release states that in consideration of the payments listed in ¶ 1, Campbell:

> 1) Hereby unconditionally release[s] ALLIANCE ... from any and all claims arising out of my employment and termination from employment including, but not limited to, any claims for wrongful discharge or for discrimination based upon age, race, color, religion, sex, national origin, or handicap....

Release ¶ II. As in *Nicholas,* here too "[i]t is difficult to imagine language that could inform plaintiff more clearly of the nature of [her] rights and of the fact that [she] is relinquishing those rights by signing the release." 929 F.Supp. at 731. The fifth factor weighs against a waiver as Campbell was not represented by counsel nor was she ever advised to consult an attorney.

The sixth factor, whether extra consideration was given in exchange for the release, is in dispute. Campbell claims that she was entitled to severance pay as a

matter of company policy. She further argues that the "Employee's Handbook" on which she arguably relied, dated April 22, 1997, expressly provides for the payment of unused vacation time to those employees who are terminated. *See* § II–D–13(b)(1) of the Employee's Handbook, Ex. L to the Declaration of Sheldon Eisenberger, plaintiff's counsel, in Opposition to Defendants' Motion for Summary Judgment, dated March 29, 2000 ("Eisenberger Decl."). The Employee's Handbook is silent, however, as to severance pay. Alliance maintains, on the other hand, that the payment of severance is entirely discretionary under the "Associate Handbook on Personnel Benefits and Administrative Policies and Procedures," dated September 1997 and in effect at the time of Campbell's termination. *See* Collins Aff. Ex. 9. Section 112 of the Associate Handbook states that the "Company, *at its discretion, may* award severance pay to Associates to compensate for the loss of their jobs." (emphasis added). The discretionary nature of severance payment is further supported by the testimony of Laura Kozelouzek. *See* Kozelouzek Dep., Ex. 10 to the Eisenberger Decl., at 446 (it was not Alliance's policy or common practice to give severance to employees who were terminated). Section 301 of the Associate Handbook, governing annual leave, provides that vacation pay will be forfeited if an Associate is terminated for cause or misconduct. In light of the above, it appears that Campbell did in fact receive compensation that she would not have otherwise received absent the signing of the Release, namely, severance pay equal to one month's salary. Thus, the sixth *Bormann* factor also weighs in favor of waiver.

Despite the fact that the majority of the *Bormann* factors favor a finding of a voluntary and knowing waiver, I cannot reject Campbell's claim that she did not understand that she would be waiving her statutory rights to bring suit by signing the Release. During her deposition, Campbell testified as follows:

Q: When you read this severance agreement, did you believe that you understood it?

A: I didn't understand it. I understood that if I signed this agreement, that I would get the monies that were due to me.

Q: What about the severance agreement did you not understand, and you can refer to specific language if you would like?

A: I didn't understand what I understand now, that I was waiving my rights when I signed it.

Campbell Dep. at 172–73. In the Affidavit of Ingrid Campbell in Opposition to Defendants' Motion for Summary Judgment ("Campbell Aff."), plaintiff also states that she "did not understand that by signing [the Release] I would be waiving my right to file a claim of racial discrimination against Alliance." Campbell Aff. ¶ 41. The assertion that Campbell's understanding was limited to the scope of the severance package is further supported by the following testimony of Daria Semkow:

Q: Now, when you gave Ingrid the release, did you read it with her?

A: Yes, I did.

Q: And did you explain it to her?

A: We read line by line to make sure that she understood what it said because if I remember correctly, it does have some language that's not, you know, that's legal.

Q: And did Ingrid have any questions when you read it to her?

A: I know we read it together slowly, and my impression after we were done with the documents is that *she understood that in order to receive her severance she would need to sign the release and that was understood by her.*

Semkow Dep., Ex. 2 to the Supplemental Affirmation of Christopher J. Collins

("Collins Supp. Aff."), at 741–42 (emphasis added).

■ Thus, Campbell's evidence, consisting of her sworn affirmation as well as deposition testimony, presents a credibility issue which cannot be resolved on summary judgment.[3] *See Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1113 (2d Cir.1992) ("Summary judgment should not be used ... where credibility issues remain on disputes of material fact even though those disputes concern the inferences which may be drawn from indirect proofs."). Accordingly, there is a question of material fact regarding the validity of the Release which precludes summary judgment on that ground. I turn now to the merits of Campbell's claims.

### C. Plaintiff's Failure to Promote/Disparate Impact Claims

"In order to establish a prima facie case for failure to promote, the plaintiff must allege that: 1) she 'is a member of a protected class;' 2) her job performance was satisfactory; 3) she applied for and was denied a promotion for which she was qualified; and 4) the position 'remained open and the employer continued to seek applicants.' " *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir.2000) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir.1998)).

■ Although Campbell claims that Alliance discriminated against her with respect to promotions, she admits that (1) she never applied for a different position at Alliance; (2) no position was filled while she was Operations Manager that she believed she should have been offered; (3) she never applied for a promotion at Alliance that she did not receive, and (4) she never had discussions with anyone at Alliance about the possibility of being promoted to a different position. Campbell Dep. at 146, 380, 382–84. These undisputed facts preclude Campbell from pursuing any claim for failure to promote. *See Brown*, 163 F.3d at 709 (in order to pursue a failure to promote claim, a plaintiff must have "applied for a specific position or positions and [be] rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion").

■ Nor may Campbell recast her claim for disparate treatment as one for disparate impact. Plaintiff argues that Alliance's employment practice of not hiring blacks for Center Manager or General Manager positions, which are senior to that of Operations Manager, affected her adversely. A plaintiff cannot merely allege a policy which purportedly singles out minority employees in order to convert a disparate treatment claim into a disparate impact claim. Courts have dismissed disparate impact claims containing such allegations. *See, e.g., Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir.1992) (dismissing disparate impact claim where plaintiff's alleged facially neutral employment practice coalesced with his claim for wrongful discharge); *Shtino v. Aponte*, 93 Civ. 4617, 1995 WL 396581, at *10 (S.D.N.Y. July 5, 1995) ("The Second Circuit has been vigilant in precluding plaintiffs from using disparate impact theory to revive a failing disparate treatment claim.").

Plaintiff cites statistics for the proposition that during the period 1996–1998, no blacks were promoted or hired to positions of General Manager or above. *See* Eisenberger Decl. Ex. BB (Report of Plaintiff's Statistical Expert, Harriet Zellner, Ph.D., of Integral Research Inc., dated November

---

**3.** Although plaintiff's claimed lack of understanding precludes summary judgment on waiver grounds, it cuts against her prima facie case with regard to the qualification prong, *see infra.* Presumably, if a managerial level employee could not understand the straightforward terms of the Release in issue, it is highly unlikely that she could function as an effective Operations Manager. Whether such a presumption is appropriate need not be decided given the overwhelming evidence of plaintiff's incompetence, *see supra.*

30, 1999, Appendix Table 1–A and 1–B). This so-called "inexorable zero," according to plaintiff, proves disparate impact arising from Alliance's promotion policies. What plaintiff overlooks, however, is that she was not harmed by any identifiable employment policy given that she did seek to be promoted to either Center Manager or General Manager while at Alliance. Campbell's claims for wrongful termination, insufficient assistance, and unfair performance evaluations do not identify a facially neutral employment practice that had an adverse impact on her as a member of a protected class. Plaintiff's disparate impact claim must therefore be dismissed.

### D. Plaintiff's Termination Claim

#### 1. Legal Standard for Discriminatory Termination

The Supreme Court has "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Accordingly, under the *McDonnell Douglas* framework, applicable to plaintiff's wrongful termination claim, a plaintiff must first prove a prima facie case of discrimination. *Id.; see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff meets this burden, the employer must produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr.*, 509 U.S. at 509, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089). If the defendant produces such evidence, "the presumption raised by the prima facie case is rebutted, and drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742. Despite

these shifting burdens, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, — U.S. —, —, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

#### 2. Plaintiff's Prima Facie Case

In order to make out a prima facie case of discriminatory discharge, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. 1089). The burden of proof that a plaintiff must meet at the prima facie stage in order to survive summary judgment is de minimis. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1115 (2d Cir.1988). Nonetheless, a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive.[4] *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).

Alliance argues that plaintiff has failed to establish a prima facie case for two reasons: (1) she was not qualified for the position as evidenced by her multiple probations; and (2) the circumstances of her termination do not give rise to an inference of discrimination. While plaintiff has failed to establish that she was qualified for her position, based on the overwhelming and uncontradicted proof of

---

**4.** In this regard, courts "must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture ... After all, '[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'" *Bickerstaff*, 196 F.3d at 448 (quoting 1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997)).

plaintiff's incompetence as an Operations Manager,[5] I will nonetheless turn to the second prong—an inference of discrimination. Plaintiff points to the following circumstances as indicative of racial animus. Upon close examination, however, none of these circumstances, taken separately or in combination, evidence racial discrimination.

### a. Similarly Situated Individuals

■ One way to create an inference of discrimination is to show that similarly situated employees, outside plaintiff's protected class, were treated preferentially. *See Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997). Campbell points to Karen Stagg and Michael Santeusanio, who were also Operations Managers, as two similarly situated white employees who were allegedly treated more favorably than her. Plaintiff claims that the favorable treatment consisted of better pay, more training, and the assistance of billing coordinators.

■ The problem is that neither of these two individuals is similarly situated to plaintiff. "In order for employees to be 'similarly situated' for purposes of establishing a plaintiff's prima facie case, they 'must have engaged in conduct similar to the plaintiff's.'" *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir.1999) (citation omitted). *See also Lowe v. J.B.*

*Hunt Transport,* 963 F.2d 173, 175 (8th Cir.1992) (fellow employee who did not suffer from same performance failings as plaintiff was not similarly situated).

Both Stagg and Santeusanio performed well as Operations Managers. There were no complaints about Stagg's performance as an Operations Manager. Semkow Dep. at 934–35. While Stagg did receive a warning letter dated October 8, 1998 detailing three areas in which she needed improvement (urgency, lack of leadership, time management), this letter was critical of her performance as a General Manager, not an Operations Manager. *See* Eisenberger Decl. Ex. Z. As an Operations Manager, Stagg received an overall performance appraisal of good. *See* Plaintiff's Ex. 100, Ex. 9 to the Collins Aff. Santeusanio similarly never received any complaints nor did he receive any written warnings or negative evaluations concerning his job performance as Operations Manager. In fact, in September 1998, he received an overall performance rating as outstanding. *See* Harris Aff. Ex. 2. Clearly, neither Stagg nor Santeusanio are similarly situated to plaintiff, who exhibited serious performance problems and received numerous written warnings while an Operations Manager. Comparison to these individuals does not support plaintiff's discrimination claims.[6]

---

5. During her nine month tenure as Operations Manager, plaintiff received four probation letters identifying inadequate job performance in many areas. While plaintiff disagrees with the findings in these letters, *see* Campbell Aff. ¶¶ 31, 35, 37, subjective disagreement cannot create a triable issue of fact. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996) (plaintiff's assessment of her qualifications is given little weight). Thus, it is beyond dispute that Campbell was not performing up to Alliance's legitimate performance expectations at the time she was discharged. *See Christensen v. Bristol–Myers Squibb Co.,* 86 Civ. 183, 1994 WL 469382, at *6 (S.D.N.Y. Aug. 30, 1994) (holding that plaintiff did not perform her job satisfactorily where she had been told numerous times that she was not performing at the level expected and was

given two poor performance reviews), *aff'd in part, rev'd in part,* 57 F.3d 1063 (2d Cir. 1995); *Stein v. McGraw–Hill, Inc.,* 782 F.Supp. 207, 211 (S.D.N.Y.1992) (two years of warnings and poor evaluations suggested that plaintiff's performance did not meet his supervisors' expectations and that "they did not view him as worthy of continued employment").

6. Even if these individuals were similarly situated, plaintiff's claim that they were paid more than her is factually incorrect. Plaintiff's starting salary was $33,000, *see* Eisenberger Decl. Ex. B, which was also the starting salary of Karen Stagg. *Id.* Ex. Y. In fact, plaintiff was paid more than Michael Santeusanio whose starting salary was $32,000. *See* Harris Aff. Ex. 2. Plaintiff's claims that these two white employees received preferential

### b. Lack of Training

██ Plaintiff claims that she received no training or assistance and that this demonstrates a racial animus by Alliance. Specifically, plaintiff claims that she received insufficient training from Lisa Roeck, *see* Campbell Aff. at ¶ 6, and that Semkow, while promising to train plaintiff in billing, never did so. *Id.* ¶ 21. According to plaintiff, Semkow was busy at another center training Karen Stagg. *Id.* Campbell also complains that the time allotted for her to work with Sharon Fields to learn the billing system was insufficient and that such training had to take place late in the evening. *Id.* ¶ 22; *see also* Campbell Dep. at 222. This purported lack of training is belied by the record and, in any event, is not indicative of racial animus.

During the relevant time period, Alliance did not have a formalized training program for Operations Managers. Semkow Dep. at 130. Instead, Operations Managers were trained in the same manner in which most managers were trained, namely, by mentoring and working alongside other managers. Kozelouzek Dep. at 126. Campbell acknowledged that she received this informal type of training from several individuals. For instance, Lisa Roeck provided assistance and training to Campbell and established a temporary office at 26 Broadway to do so. Campbell Dep. at 219–21. While complaining that Roeck's assistance would have been more useful if provided earlier, Campbell concedes that "[w]ithin the last two weeks, since Lisa [Roeck] has been here, I have been given a lot of information that I have taken and ran with." [7] Eisenberger Decl. Ex. C (Memorandum dated May 1, 1997 from Ingrid Campbell to Laura Kozelouzek).

Campbell also received training from Sharon Fields, the New York City Billing Coordinator, who assisted the various Centers, including 26 Broadway, until the time of her resignation in late 1997. Campbell Dep. at 157–59. Campbell acknowledges that Fields always responded to her requests for assistance in billing. *Id.* at 222–23. Campbell called Fields several times after her training was completed to ask questions with regard to billing. *Id.* at 223. In fact, Campbell once remarked that "Sharon Fields has been a great help and is a great asset to Alliance Business Centers." Eisenberger Decl. Ex. C.

Furthermore, Campbell received assistance from Santeusanio, a more experienced Operations Manager. Campbell Dep. at 223–24; *See also* Deposition of Michael Santeusanio ("Santeusanio Dep."), Ex. 5 to the Collins Aff., at 44–45. On one occasion, Santeusanio went to Campbell's Center to assist her in a resolving a billing problem created when she incorrectly input information into the billing system. Campbell Dep. at 223–24. Campbell also called Santeusanio, at Semkow's suggestion, for billing advice which he readily provided. Campbell Dep. at 225; Santeusanio Dep. at 45. Campbell also received substantial assistance from Gwendolyn Williams, a Sales Coordinator at 26 Broadway, who had previously been an Operations Manager at the 599 Lexington Center. Deposition of Gwendolyn A. Williams ("Williams Dep."), Ex. 4 to the Eisenberger Decl., at 97. According to Williams, she assisted Campbell in training, hiring new employees, conducting staff meetings and other day-to-day activities of running the Center. Williams Dep., Ex. 6 to the Collins Aff., at 102–03.

In addition to the extensive one-on-one training outlined above, Campbell took word processing and management classes

---

treatment in other areas are also lacking in evidentiary support. *See infra* pp. 245–46 (training); pp. 246–47 (assistance of billing coordinators).

**7.** The fact that Semkow did not train Campbell herself is of little significance because Semkow delegated that responsibility to Roeck, whose job it was to assist and train Operations Managers. *See* Semkow Dep. at 367.

while an Operations Manager. Campbell Dep. at 354, Ex. 1 to the Collins Supp. Aff., at 354. She did not ask to attend any other classes. *Id.* Plaintiff's claim that Stagg received more training than her is not factually supported. Stagg testified that Semkow was not involved in her training which, as with Campbell's training, was delegated to Lisa Roeck. *See* Deposition of Karen Stagg, attached as Exhibit 4 to the Collins Affirmation ("Stagg Dep.") at 38. Stagg similarly complained of the lack of assistance from Semkow. *Id.* In short, there is no evidence that plaintiff received less training than any other Operations Manager or that she received inadequate training as the result of racial animus.

### c. Absence of a Billing Coordinator

Plaintiff's Complaint alleges that Alliance "refus[ed] to employ a billing coordinator at the [26] Broadway Center" and that "[i]n all of the other Alliance centers, where the Operations Managers were white, the Operations Manager was not responsible to perform [sic] the billing function" but "[i]nstead the white Operations Managers were provided with a billing coordinator, who performed all billing functions." Complaint ¶¶ 32–33. These allegations are simply false.

Sharon Fields was the Billing Coordinator for all of Alliance's New York City Centers, including 599 Lexington Avenue, 885 Third Avenue, and 26 Broadway. Campbell Dep. at 157–58; Stagg Dep. at 35. When Ms. Fields resigned in 1997, Campbell started doing the billing at 26 Broadway. Campbell Dep. at 158–59, 162. The genesis of plaintiff's allegations of disparate billing resources may be the fact that Semkow once informed Campbell that Stagg had a word processor to help her with her billing functions. *Id.* at 229. However, after Fields left, Campbell also began training a word processor to help

her with billing. *Id.* at 229–30. In any event, after Fields left and the Billing Coordinator position was eliminated, the billing function became the sole responsibility of each Operations Manager. Santeusanio Dep. at 31; Semkow Dep. at 934; Kozelouzek Dep. at 133, attached as Ex. 10 to the Eisenberger Declaration. Thus, the allegation that the white Operations Managers were given billing coordinators, while Campbell was not, is not factually supported.

### d. Exclusion from Firm Luncheons

■ Plaintiff's Complaint alleges that she was prohibited from attending two social functions while at Alliance: one a goodbye luncheon for Jody Walters and the other an informal luncheon to celebrate the promotion of Santeusanio. Campbell Dep. at 274–75. While Ms. Walters had initially invited Campbell to her luncheon, she withdrew that invitation because it would have created a coverage problem at 26 Broadway. *Id.* at 274. Campbell was not invited to the Santeusanio luncheon. *Id.* at 275. Campbell admits that two other black employees, Sharon Fields and Erika Innes, were invited to that luncheon. *Id.* at 277. Moreover, Campbell did go to a firm function in Scottsdale, Arizona, *id.* at 275, and a trip to the Hamptons. *Id.* at 278. Campbell's exclusion from the two functions does not support her claim of racial discrimination.[8]

### e. The Missing $1,700

Campbell complains that in May 1997 she was held jointly responsible with the Sales Coordinator for the disappearance of a $1,700 cash payment received from a client. Campbell Aff. ¶ 27. Campbell's May 20, 1997 probation letter notes the disappearance of $1,700 in cash but states that "[a]lthough no one had been accused

---

**8.** In addition to not constituting evidence of racial animus, these "exclusions" from two social gatherings cannot qualify as adverse employment actions. *See Brennan v. City of White Plains,* 67 F.Supp.2d 362, 374 (S.D.N.Y.1999) (exclusion from meetings did not constitute an adverse employment action where plaintiff could not show that it affected her working conditions).

or directly blamed for the disappearance of funds given to the Sales Coordinator as payment for office space, the responsibility for this still lies between the two of you, and it is noted that no resolution has been made, nor has the money been found." Ex. 11 to the Campbell Dep., Ex. 8 to the Collins Aff.

■ Because it was subsequently determined that the $1,700 had not been taken by Campbell, Semkow Dep. at 844, Campbell objected to the charge and demanded that it be removed from her personnel file. Campbell Aff. ¶ 27. However, as Operations Manager, Campbell was responsible for insuring the correct processing of daily bank deposits. *See* Ex. 5 to the Campbell Dep., Ex. 8 to the Collins Aff. Thus, the criticism remaining in Campbell's personnel file was not that she stole the money but that she had incorrectly failed to account for it. Semkow Dep. at 845 ("The error would have been made by the operations manager by not recording the deposit in her records at the center, keeping a deposit slip for the deposit of that money."). Accordingly, the refusal to expunge the accusation of shoddy bookkeeping provides no evidence of racial discrimination.

### f. Derogatory Comments

■ Campbell testified that in 1996 her then supervisor, Lisa Roeck, told her not to hire anyone for the receptionist position who was not light-skinned or who had an accent, braids, big earrings or nose rings. Campbell Aff. ¶ 64. Assuming this accusation to be true, the statement was remote in time, before Campbell was an Operations Manager, and isolated. In addition, the comment did not relate to the decision to terminate Campbell's employment and was made by a non-decisionmaker. This is the kind of isolated and stray

remark that is insufficient to establish racial animus and defeat a motion for summary judgment. *See, e.g., Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote form the date of decision."); *Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984) (most recent statements by Company's founder, made at least three years prior to employee's discharge, were remote in time and were not relevant to the discrimination claim).

### g. "Low Opportunity Hiring" Argument

Plaintiff alleges that Alliance purposefully assigned only black Operations Managers to 26 Broadway, where they were doomed to fail at this "dead-end" facility. Prior to Campbell, Marilyn Rembert served as Operations Manager. Campbell Aff. ¶ 59. After Campbell's termination, Gwendolyn Williams became Operations Manager. *See* Deposition of Gwendolyn Williams ("Williams Dep."), Ex. 6 to the Collins Aff., at 184.[9] Both Ms. Rembert, who resigned from Alliance, and Ms. Williams, who was terminated, are black. Campbell Aff. ¶ 59. Plaintiff argues that the consecutive hiring of three black Operations Managers for Alliance's 26 Broadway Center reflects a discriminatory policy.[10]

■ Plaintiff's argument is meritless. In making this "low opportunity hiring" argument, plaintiff assumes that Alliance assigned these black employees to the 26 Broadway Center with the intention that they would fail to perform and would ultimately leave the company either volun-

9. It appears that Ms. Williams was originally transferred to 26 Broadway as a Sales Coordinator, *not* an Operations Manager. *Id.*

10. This argument is partially refuted by the fact that the next Operations Manager of 26 Broadway was a white woman, Stephanie Rothstein, hired in April 1998. *See* Plaintiff's Exhibit 93, Ex. 9 to the Collins Aff.

tarily or involuntarily.[11]  Courts must be careful in drawing a distinction between evidence that allows a rational inference of discriminatory intent and evidence that gives rise to mere speculation and conjecture on that subject.  *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990).  As courts frequently explain to jurors, "[a]n inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]."  1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions ¶ 6.01 (1997); *see also* Black's Law Dictionary 700 (5th Ed.1979) ("An inference is a deduction of fact that may logically and reasonably be drawn form another fact or group of facts found or otherwise established in the action.").

Here, the inference suggested by plaintiff is that because Alliance assigned three black employees to 26 Broadway, and all of them left the company, Alliance purposefully sent Campbell to that location so she would fail.  Such an inference is not supported by any facts and is contrary to Alliance's own self-interest.  Alliance did not need to re-hire Campbell in order to plan and plot her eventual termination.  Plaintiff's suggestion, both illogical and counterintuitive, is also purely speculative.  Because jurors would be instructed not to consider such an inference when deliberating, it cannot raise a genuine issue of material fact at the summary judgment stage.  Accordingly, plaintiff's "low-opportunity hiring" argument cannot defeat defendants' summary judgment motion.

### h.  Miscellaneous Allegations of Discrimination

■  In sum, there is no evidence in the record to support an inference of discrimination.  The same is true of the myriad of additional allegations which plaintiff has raised in an effort to throw the proverbial

kitchen sink into this case.  These allegations include:  that plaintiff was required to do the work of sales coordinator, operations manager and billing coordinator simultaneously;  that plaintiff was forced to work late hours;  that plaintiff was reprimanded for taking the car service home;  and that conditions at 26 Broadway were deplorable.  In the absence of proof of disparate treatment, these allegations merely reflect the demanding conditions of a tough work environment but do not demonstrate racial discrimination.

### 3.  Defendants' Non–Discriminatory Reason for Plaintiff's Termination

### a.  Same Actor Inference Applies

■  In *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied*, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998), the Second Circuit recognized what is known as the "same actor inference."  Basically, " 'in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.' "  *Id.* (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)).  The Second Circuit has found the inference more compelling where the termination occurs within a relatively short time after the hiring.  *Cf. Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d Cir.), *cert. denied*, 120 S.Ct. 2718 (2000) (seven years between hiring and firing significantly weakens the inference).  Accordingly, where the interim period is under two years, the same actor inference remains significant.  *Id.* (citing, *inter alia*, *Grady*, 130 F.3d at 561 (eight days between hiring and firing provides strong inference) and *Proud*, 945 F.2d at 797 (six month period provides strong inference)).  Here, the

---

**11.**  An inference could be drawn that the consecutive hiring of minority employees represents an admirable attempt on the part of

Alliance to integrate minorities into its managerial workforce despite having faced significant problems doing so.

time period between Campbell's re-hiring and her termination was approximately nine months, which is well within the time frames approved of in *Carlton*.

■ Plaintiff does not dispute the temporal proximity of her hiring and firing but nonetheless argues that the same actor inference is inapplicable for a different reason, namely, that the same person who hired Campbell was not the same person who fired her. Specifically, Campbell argues that it was Kozelouzek alone who hired her, and only conferred with Semkow as a matter of courtesy, and that the decision to fire Campbell was made solely by Semkow in the first instance. Plaintiff also argues that the involvement of Linda Harris, Alliance's Senior Vice President for Human Resources, in her termination also destroys the same actor inference. These arguments, however, are unsupported by any evidence in the record.

When asked who hired Ingrid Campbell, Semkow responded "Laura and myself." Semkow Dep. at 343. While Semkow did concede that Kozelouzek consulted with her as a matter of courtesy, *id.* at 344, the following colloquy preceded this concession:

Q: Were you necessary to give permission for Ingrid Campbell to be hired?

A: Yes.

Q: And why were you necessary for the permission?

A: It was my region and it was one of the centers that I was responsible for.

*Id.* In addition, Kozelouzek testified that she discussed Campbell's rehiring with Semkow and Roeck. Kozelouzek Dep. at 125. Thus, the decision to re-hire Campbell was a joint decision made by Kozelouzek and Semkow together. *See* Semkow Dep. at 359 ("The decision was a joint decision, it wasn't Laura's sole decision. We decided that we would hire her.").

So too was the decision to fire Campbell. Although Semkow did testify that the deci-

sion to fire Campbell was made by her, it was made only after she consulted with Kozelouzek and Harris. Semkow Dep. at 724 ("I brought it to the attention of Laura and of Linda Harris because of the ongoing problems that I was having with Ingrid Campbell."). *See also* Kozelouzek Dep. at 141 (the decision to fire Campbell "was discussed with Daria [Semkow], myself and Linda Harris"). Thus, the decision to terminate Campbell was also a joint decision made by Semkow and Kozelouzek.

Plaintiff makes much of Harris' involvement in her termination. However, the evidence shows that Harris' involvement was ministerial in nature and that she did not have any substantive input into the ultimate decision to terminate plaintiff. In this regard, Kozelouzek testified as follows:

Q: Well, when she was terminated, would that be something that Daria [Semkow] could do without discussing it with you?

A: No, that's something that Daria would have discussed with me and she would have needed to get approval from Linda Harris.

\*　　\*　　\*　　\*　　\*　　\*

Q: Well, what, if anything, would Linda Harris have or what role would she play with regard to the review of termination of any employee at Alliance?

A: Before anyone's terminated, Linda has to, I guess, review the probation letter or the termination letter.

Kozelouzek Dep. at 367, 370, attached as Exhibit 10 to the Eisenberger Declaration. The limited role of Linda Harris in Campbell's termination is further supported by the Affidavit of Linda Harris, dated February 29, 2000 ("Harris Aff."). In that affidavit, Harris states:

In the fall of 1997, Daria Semkow and Laura Kozelouzek discussed with me their decision to terminate the employment of Ingrid Campbell based on their

conclusion that her performance was not satisfactory. I did not have any first-hand knowledge of Campbell's performance, and at the time had only been employment [sic] by Alliance for several months (since July 14, 1997). I was not involved in the decision to terminate Campbell's employment, but did discuss with Kozelouzek or Semkow providing Campbell with severance in exchange for her execution of a release of claims.

Harris Aff. ¶ 2.

Even if Harris' involvement could be characterized as significant, the same actor inference would still apply. Harris' involvement, whatever it may be, does not diminish the significant roles played by Semkow and Kozelouzek in hiring and firing plaintiff. The decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions. *See Ralkin v. NYCTA*, 62 F.Supp.2d 989, 1000 (E.D.N.Y.1999) (court held same actor inference applied where manager, who may not have actually hired employee-plaintiff, interviewed plaintiff and made the recommendation to hire her and played a significant role in the decision to fire her). Thus, the same actor inference applies despite Harris' presence.

■ Having established the applicability of the same actor inference, it is still necessary to assess its impact here. As explained by the Fourth Circuit:

[t]he relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the [*McDonnell Douglas*] analysis ... [T]his fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual. The plaintiff still has the opportunity to present countervailing evidence of pretext, but in most cases involving this situation, such evidence will not be forthcoming. In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.

*Proud*, 945 F.2d at 798. Thus, the same actor inference affects the weight to be given to the employer's proffered non-discriminatory reason for the adverse employment action taken. Apart from the *McDonnell Douglas* burden shifting analysis, the same actor inference is also relevant to the ultimate question of discrimination. "When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer." *Id.* Here, this inference of non-discrimination is further supported by plaintiff's own affidavit where she states that prior to resigning from Alliance in 1996, she was not personally subjected to any racial discrimination directed against her. *See* Campbell Aff. ¶ 48.

### b. Pretext

■ Defendant has presented a legitimate, nondiscriminatory reason for plaintiff's termination, namely, unsatisfactory performance. Once the employer produces sufficient evidence to support a nondiscriminatory reason for its decision, the plaintiff must be afforded the " 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Reeves*, —— U.S. at ——, 120 S.Ct. at 2106 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

"Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' ..., or by reliance on the evidence comprising the prima facie case, without more...." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir.1994) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089, citing *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742). Plaintiff may also establish pretext by demonstrating that similarly situated employees were treated different-

ly than she was. *See Francis v. Runyon,* 928 F.Supp. 195, 202 (E.D.N.Y.1996) (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817). However, Campbell has failed to offer any evidence that any similarly situated employees were treated differently than she. Nor has plaintiff presented any other evidence that Alliance's stated basis for termination was pretextual. Thus, even had Campbell presented a prima facie case, her claims would still be dismissed because she has failed to show that Alliance's legitimate, nondiscriminatory reason for discharging her was pretextual.[12]

Plaintiff has not established a prima facie case of racial discrimination, nor has she shown that Alliance's reason for her termination was a pretext for discrimination. It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have been subjected to discrimination. A plaintiff who *could* have been subjected to discrimination by virtue of being a member of a protected class, but was not, could reap an unwarranted windfall if her Title VII claim survives summary judgment in the absence of any proof of discrimination. Title VII, an important statute, must not be exploited and diluted as a result of misuse and misapplication by disgruntled employees who happen to be members of a protected class.

## III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and this case is dismissed. The Clerk of the Court is directed to close this case.

---

12. The Supreme Court has recently held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* — U.S. at —, 120 S.Ct. at 2109. This holding is of no use to plaintiff, who has failed to present a prima facie case and, even if she had, has failed to show that Alliance's proffered explanation is pretextual. Thus, even under the liberal standard articulated in *Reeves,* plaintiff's case must be dismissed.