Honey SELTZER, Plaintiff,

v.

DRESDNER KLEINWORT
WASSERSTEIN, INC.
Defendant.

No. 03 Civ. 5908(DC).

United States District Court,
S.D. New York.

Jan. 27, 2005.

The Law Firm of Louis Ginsberg, P.C., By: Louis Ginsberg, New York, New York, for Plaintiff.

Epstein Becker & Green, P.C., By: Kenneth J. Kelly, Lauren Malanga Casey, New York, New York, for Defendant.

## OPINION

CHIN, District Judge.

In this employment case, plaintiff Honey Seltzer sues her former employer, defendant Dresdner Kleinwort Wasserstein, Inc. ("Dresdner"), for unlawful discharge, purportedly because of her age, in violation of federal, state, and city law, and for unpaid overtime wages under the Fair Labor Standards Act (the "FLSA"). Defendant moves for summary judgment dismissing all claims.

The motion is granted, for no reasonable jury could find that Seltzer was discriminated against because of her age or that she was entitled to overtime pay. Rather, the record shows that Seltzer was hired by Dresdner when she was 64 years old and that she served, for most of her time at Dresdner, as executive assistant to the

president of Dresdner. She earned as much as $120,000 a year in salary and bonus, and clearly she was exempt from the wage and hour laws. She was not discharged until the executive for whom she worked—the president—left Dresdner and several hundred other employees were also discharged as part of a substantial reduction-in-force. Accordingly, judgment will be entered in favor of Dresdner dismissing the complaint.

## BACKGROUND

### A. *The Facts*

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows:

#### 1. *Seltzer is Hired*

Honey Seltzer began working at Wasserstein Perella & Co., which later became Dresdner, in 1994, when she was 64 years of age.[1] (Seltzer Dep. at 1, 17). She was hired as an executive assistant to Fred Seegal, who was Dresdner's President and a Managing Director. (Seltzer Dep. at 15–17). Seltzer had previously worked for Seegal for approximately six years at Salomon Brothers. (*Id.* at 15–16). Seltzer worked at Dresdner continuously from 1994 until she was discharged, along with 129 other employees, on September 18, 2002. (Seltzer Aff. ¶ 31; Soto Aff. ¶ 10). Throughout her tenure, Seltzer was classified by Dresdner as an exempt employee and she was not paid overtime. (Seltzer Aff. ¶ 10).

#### 2. *Seegal Moves to San Francisco*

From the time Seltzer was hired until May 2000, Seltzer worked as Seegal's executive assistant. (*Id.* ¶ 2). In May 2000, Seegal announced that he was moving to Dresdner's San Francisco office. (Seltzer Dep. at 26; Soto Aff. Ex. E). Seegal asked Seltzer to transfer to San Francisco with him but she declined his offer. (Seltzer Dep. at 26). When Seltzer learned that Seegal was moving to San Francisco, she contacted Lisa Desmond, a vice president of administration at Dresdner, and informed her that she wanted to stay in Dresdner's New York office. (*Id.* at 28–29). Seltzer claims there were "several" executive assistant positions available at Dresdner, and that she was told by Desmond that she had to have a position equal to her position with Seegal. (*Id.* at 29–30).

Specifically, Seltzer points to four positions available at the time Seegal announced his move to San Francisco. (*Id.* at 68–71). One was with Jeffrey Rosen, a vice chairman at Dresdner. (*Id.* at 69). Seltzer asked Desmond about the Rosen position in 2000, but was told that Rosen felt that he and Seltzer were "stylistically incompatible." (*Id.*). A second position was available with Bill Lambert, a founding partner of Dresdner. When Seltzer asked about the position with Lambert, she was told that the position required the executive assistant to stay until 6:30 p.m., and Seltzer typically left at 5:00 p.m. (*Id.* at 18–20, 122–124, 150). A third position was available with Art Reichstetter, a managing director, but Seltzer was not asked to interview for this position. (*Id.*). The fourth position was the position that Seltzer was eventually assigned, with Ken Tuchman, a vice chairman.[2] (*Id.*). There

---

[1]. Wasserstein Perella & Co. merged with Dresdner Kleinwort Benson, N.A. in 2001, forming a new entity, Dresdner, the defendant herein. (Soto Aff. ¶ 2).

[2]. Seltzer was not offered the position with Tuchman when she first sought it in May/June 2000, but she was offered the position in July, after the executive assistant who had been hired for Tuchman was discharged. (Seltzer Dep. at 53, 151).

was not a change in Seltzer's employment status or salary between the time Seegal announced his departure in May 2000, and Seltzer's transfer to work for Tuchman in July 2000. (*Id.* at 152).

### 3. *Seltzer Is Assigned to Work for Tuchman*

In early July 2000, Seltzer traveled to San Francisco to assist Seegal in his transition from New York. (*Id.* at 35). On July 15, 2000, after returning from San Francisco, Seltzer was assigned to work for Tuchman. (*Id.* at 30). Seltzer's responsibilities and salary remained the same as when she worked for Seegal. (*Id.* at 35–36). Seltzer had a good relationship with Tuchman and preferred working for Tuchman over Seegal. (*Id.* at 36). Seltzer "had more confidence that Mr. Tuchman would remain with the company.... [Seltzer] always felt that Mr. Seegal had one foot out the door." (*Id.* at 37). Tuchman gave Seltzer positive reviews, and neither Tuchman nor Seltzer ever complained to anyone at Dresdner about their working relationship. (*Id.* at 38; Gold Aff. Ex. A).

Seltzer alleges that Tuchman discriminated against her based on her age. (*Id.* at 39). Seltzer claims that she was discriminated against "[b]ecause [Tuchman] liked to look at young pretty women." (*Id.*). Seltzer did not feel "offended" by Tuchman's conduct, but did feel discriminated by one particular incident that took place at some point in Spring 2001:

> Q. Okay. Can you tell me, then, how else you felt Mr. Tuchman discriminated against you?
> A: [Tuchman] had bought his wife a magnificent diamond bracelet, and he showed it to me. And I said it was absolutely magnificent. And he said, I hope she hates it, you know, because it

was very expensive. And I kept saying, oh it[']s so beautiful, she's going to love it. And then he said to me, if you were twenty years younger and blonde and beautiful, you'd get one. And I found that offensive.

(*Id.* at 46). Seltzer never reported the incident to anyone nor did she discuss the incident with any co-workers, friends, or family. (*Id.* at 46–47, 51). Seltzer did not ask to be transferred from her position with Tuchman. (*Id.* at 46–47).

Other than this incident, Seltzer does not allege that Tuchman said or did anything discriminatory toward her. (*Id.* at 53, 68). Seltzer worked for Tuchman until June 2001. (*Id.* at 54). At that time, Seegal returned to New York. (*Id.*).

### 4. *Seltzer Returns to Work for Seegal*

When Seegal returned to the New York office in June 2001, he arranged with Tuchman for Seltzer to return to her position as Seegal's executive assistant. (*Id.* at 55). Seltzer would have preferred to remain in her position with Tuchman, but she did not inform Seegal of her preference. (*Id.* at 56). Contemporaneous with Seltzer's transfer back to Seegal, Seltzer typed the following note to herself: "I did not object because though [Tuchman] in his own way was is less stressful, I'm underutilized working for him."[3] (*Id.* at 56). Seltzer did inform Tuchman of her desire to stay with him, but Tuchman told her that as much as he liked Seltzer, he was not "going to fight over" her. (*Id.* at 100–01). Seltzer worked for Seegal from June 2001 until August 2002, when Seegal left Dresdner. (*Id.* 107–08; Soto Aff. ¶ 10).

---

**3.** Seltzer kept numerous type-written notes of various conversations and events during her tenure at Dresdner. She did this as an "out-

let" when something "upset" her, because "writing it down [made her] feel better." (Seltzer Dep. at 49).

### 5. *Seltzer's Dismissal from Dresdner*

In August 2002, after Seegal left Dresdner, Seltzer went to Evelyn Soto, a vice president in human resources, to discuss her future with Dresdner. (*Id.* at 203–04; Soto Aff. ¶ 1). Soto told Seltzer that if a position became available, she would tell Seltzer. (Seltzer Dep. at 204). At some point after this conversation, Soto approached Seltzer about a possible position with Anne Short, a managing director. (*Id.* at 112). Seltzer never interviewed for or heard any other information about this position. (*Id.*). There was another position available with Julian Markby, a managing director. (Soto Aff. ¶ 11). The Markby position was an administrative assistant position that required the assistant to work for Markby and two other bankers. (*Id.*). The position was eventually filled by the floater who had been temporarily assigned to the Markby position.[4] (*Id.*). Seltzer is not aware of any other positions that were available in August or September 2002. (Seltzer Dep. at 202–03). Seltzer was discharged on September 18, 2002, along with approximately 129 other Dresdner employees. (Seltzer Aff. ¶ 31; Soto Aff. ¶ 10). The Dresdner restructuring resulted in the dismissal of 352 employees in 2002. (Soto Aff. ¶ 2). Anne Short, the managing director to whom Soto had discussed assigning Seltzer, was also let go on September 18, 2002. (Soto Reply Aff. ¶ 2). Of the thirty-three executive or administrative assistants who were fired in 2002, twelve were forty years or older. (Soto Aff. ¶ 13, Ex. H).

After Seltzer's dismissal, Seegal asked her to come work with him at his new job at Stephens Financial Group, but Seltzer initially declined his offer. (Seltzer Dep. at 87). Approximately two months later Seltzer reconsidered and started working for Seegal at Stephens Financial Group. (*Id.* at 87–88).

### 6. *Seltzer's Duties and Exempt Status*

During her tenure at Dresdner, Seltzer generally worked from 7:30 a.m. until 5:00 p.m., and "virtually never took a lunch break." (Seltzer Aff. ¶ 4; Seltzer Dep. at 122–23). Seltzer's daily routine at Dresdner included arranging travel, scheduling appointments, taking care of Seegal's personal checking account, answering the telephone, and completing expense reports. (Seltzer Dep. at 17; Seltzer Aff. ¶ 8). Seltzer described her duties for Seegal as "anything that most executives of that level require from an assistant." (Seltzer Dep. at 17). In contemporaneous notes made by Seltzer in May 2001, she wrote that "[Seegal] allows me the freedom to make decisions and use my brain and I appreciate that." (Malanga Casey Aff. Ex. E). In September 2001, Seltzer wrote that she had "fabulous relationships with our major clients (many of with the heads of fortune 500 companies)." (*Id.* Ex. F). Seltzer also wrote that it was at her "suggestion that [Dresdner] hire[d] [a temp] as a permanent person." (*Id.* Ex. G). In preparation for Seegal's return from San Francisco, Seltzer wrote that she "spent the last week trying to prepare for [Seegal's] arrival in making the effort to catch up on a year's worth of activities that I wasn't privy to." (*Id.* Ex. I). Seltzer was Seegal's "lead assistant." (*Id.* Ex. H; Seltzer Dep. at 25 (Seltzer describing her-

---

4. In her affidavit, Soto asserts that Seltzer was offered the Markby position at her same salary. According to Soto, Seltzer "emphatically told [Soto] that she had no interest in working for someone like Mr. Markby and was too experienced to be working for three bankers as opposed to one very senior executive like Mr. Seegal." (Soto Aff. ¶ 11). Seltzer does not recall this conversation. (Seltzer Dep. at 113). For purposes of this motion, I assume the conversation did not occur.

self as Seegal's "main assistant")). Seegal had other assistants who worked under Seltzer and who covered the telephones when Seltzer was not at her desk and in off-hours when Seltzer was out of the office. (Seltzer Dep. at 19–26; Malanga Casey Aff. Ex. G). Some of these assistants only worked with Seegal and Seltzer. (Seltzer Dep. at 22).

Throughout her tenure with Dresdner, Seltzer was classified as an exempt employee and was not paid overtime. (Soto Aff. Ex. B). As an exempt employee, Seltzer's salary and bonus were higher than they would have been if she had been classified as a non-exempt employee (even if she had been paid overtime). (*Id.* ¶ 4). For example, Seltzer's compensation in 1999 was $114,305.68, while a similar non-exempt assistant's compensation in 1999 (including overtime pay) was $68,701.52. (*Id.*). Seltzer's base salary at the time of her dismissal was $90,000, and her bonus in 2001 was $30,000. (Soto Aff. Ex. D). Dresdner also had a written policy providing one additional week's vacation for exempt employees, and an unwritten policy allowing exempt employees unlimited sick time. (*Id.* ¶ 4, Ex. C).

Dresdner used the term "executive assistant" to refer to employees who worked for executives, as opposed to an "administrative assistant," who did not work for an executive. (*Id.* ¶ 5). Of the fifteen executive assistants who worked at Dresdner from 2000 through March 2003, eight, including Seltzer, were classified as exempt employees. (*Id.*). Dresdner asserts—and Seltzer has not disputed—that the classification was based on a combination of the assistant's experience, job responsibilities, and salary. (*Id.*). Of the eight executive assistants classified as exempt, two of them, including Seltzer, were over the age of forty. (*Id.*).

## B.  *The Instant Action*

Plaintiff filed the instant suit on August 7, 2003, within 90 days after receiving her "right to sue" letter from the Equal Employment Opportunity Commission. She alleges violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); the FLSA, 29 U.S.C. § 201 *et seq.;* the New York State Human Rights Law, New York Executive Law § 296 *et seq.;* and the New York City Human Rights Law, New York Administrative Code § 8–101 *et seq.* Specifically, plaintiff's complaint asserts five claims of age discrimination: Dresdner (1) harassed her, (2) denied her equal terms and conditions of employment, (3) denied her positions, (4) denied her overtime pay, and (5) fired her due to her age. (Compl. ¶¶ 26–33). The complaint also alleges that pursuant to the FLSA plaintiff was entitled to overtime compensation. (*Id.* ¶¶ 32–33). The case was assigned to the Honorable Lewis A. Kaplan.

The parties engaged in discovery and on May 19, 2004, Dresdner filed this motion for summary judgment. On October 15, 2004, Judge Kaplan recused himself from the case and it was reassigned to the undersigned. For the reasons set forth below, defendant's motion is granted.

## DISCUSSION

### A.  *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor to create an issue for trial. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

## B. *Age Discrimination*

### 1. *Applicable Law*

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Fields v. N.Y. State Office of Mental Retardation*

*& Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir.1997).

### a. *McDonnell Douglas Framework*

■ In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Stratton v. Dep't for the Aging*, 132 F.3d 869, 879 (2d Cir.1997) (ADEA).

Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Stratton*, 132 F.3d at 879.

■ Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120–21; *Connell v. Consol. Edison Co.*, 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

To meet this burden, the plaintiff may rely on evidence presented to establish her

*prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that she satisfies *"McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James,* 233 F.3d at 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.* at 157; *Connell,* 109 F.Supp.2d at 207–08.

As the Second Circuit observed in *James,* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia University–College of Physicians,* 999 F.Supp. 506, 513–16 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### b. *Verbal Comments and Stray Remarks*

■ Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff. *See Schreiber v. Worldco, LLC.,* 324 F.Supp.2d 512, 518–19

(S.D.N.Y.2004); *Zhang v. Barr Labs., Inc.,* No. 98 Civ. 5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000) (citing cases). Often, however, an employer will argue that a purportedly discriminatory comment is a mere "stray remark" that does not constitute evidence of discrimination. *See, e.g., Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); *Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 247 (S.D.N.Y.2000) (" 'Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.' ") (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992)).

■ In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process. *See Minton v. Lenox Hill Hosp.,* 160 F.Supp.2d 687, 694 (S.D.N.Y.2001); *Rizzo v. Amerada Hess Corp.,* No. 99 Civ. 0168, 2000 WL 1887533, at *5 (N.D.N.Y. Dec.29, 2000) ("An employer's discriminatory statements will rise above the level of stray remarks ... when the statements are: (1) made by the decision maker or one whose recommendation is sought by the decision maker; (2) related to the specific employment

decision challenged; and (3) made close in time to the decision."); *Ruane v. Continental Cas. Co.*, No. 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998); *Mosberger v. CPG Nutrients*, Civ. No. 01–100, 2002 WL 31477292, at *7 (W.D.Pa. Sept.6, 2002) ("Discriminatory stray remarks are generally considered in one of three categories—those made (1) by a non-decisionmaker; (2) by a decisionmaker but unrelated to the decision process; or (3) by a decisionmaker but temporally remote from the adverse employment decision.") (internal quotations and citations omitted).

Additionally, the Second Circuit has emphasized that "[a]lthough evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of the evidence." *Carlton*, 202 F.3d at 136 (quoting *Danzer*, 151 F.3d at 56); *see also Schreiber*, 324 F.Supp.2d at 522–23. "Even 'stray remarks in the workplace by persons who are not involved in the pertinent decision making process ... may suffice to present a *prima facie* case,' provided those remarks evidence invidious discrimination." *Belgrave v. City of New York*, No. 95 Civ. 1507, 1999 WL 692034, at *29 (E.D.N.Y. Aug. 31, 1999) (quoting *Ostrowski*, 968 F.2d at 182); *see also Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir.1993) (holding that statements made by non-decisionmakers were properly received "because they showed the pervasive corporate hostility towards [plaintiff] and supported her claim that she did not receive a promotion due to her employer's retaliatory animus"); *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 753 (4th Cir.1986) (holding that evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the determinations of intent and pretext").

## 2. *Application*

The complaint purports to assert five claims of age discrimination, but at this juncture only one claim warrants much discussion. Although the complaint asserts a claim for harassment, plaintiff has not alleged, much less attempted to prove, severe or pervasive conduct based on age. Similarly, as discussed below, she suffered no adverse consequences in mid–2000 when there was a delay in giving her a new position after Seegal decided to move to San Francisco. Plaintiff in fact moved into a new position immediately upon her return to New York from helping Seegal with his transition. Hence, although these purported incidents arguably constitute background evidence for the wrongful discharge claim, they do not support independent claims for harassment or discriminatory denial of equal terms and conditions of employment or denial of positions. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003) ("An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' ") (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993))); *Briones v. Runyon*, 101 F.3d 287, 291 (2d Cir.1996); *Shafrir v. Reform Zionists of America*, 998 F.Supp. 355, 361 (S.D.N.Y.1998). Finally, for the reasons set forth in the FLSA discussion below, Seltzer likewise cannot demonstrate age discrimination in the denial of overtime. I therefore proceed to a discussion of the discharge claim.

I address plaintiff's ADEA and state and city law claims together because "[c]laims made pursuant to the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as claims brought pursuant to the ADEA." *Molin v. Permaf-*

*iber Corp.*, No. 01 Civ. 9279(SHS), 2002 WL 31760215, at *3 (S.D.N.Y. Dec.9, 2002) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000)); *Minton*, 160 F.Supp.2d at 696–97.

At the outset, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.* Defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal, contending that Seltzer was fired because (1) Seegal voluntarily left Dresdner and thus Seltzer's position was eliminated, and (2) Seltzer was dismissed along with 129 other employees as part of a company-wide restructuring. (Def.'s Mem. at 2, 15–16). Hence, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by evaluating first plaintiff's evidence, then defendant's evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber*, 40 F.Supp.2d 516, 520 (S.D.N.Y.1999), *aff'd mem.*, 201 F.3d 432, 1999 WL 1295923 (2d Cir.1999); *Lapsley*, 999 F.Supp. at 515.

#### a. *Plaintiff's Evidence*

Plaintiff offers the following evidence in support of her age discrimination claims:

First, plaintiff was 72 years old when Dresdner discharged her.

■ Second, she was not offered a position with either Rosen, Lambert, or Reichstetter in or about May 2000. (Seltzer Dep. at 29–30, 68–71). This evidence, however, proves nothing, even assuming the facts alleged by Seltzer are true. Not only did these events occur more than two years before she was laid off, the evidence shows that Seltzer continued to work for Seegal until she returned from San Francisco on July 15, 2000. (Seltzer Dep. at 35). On that day, Seltzer started working for Tuchman at her same salary and with similar day-to-day responsibilities as she had with Seegal. (*Id.* at 35–36). There is nothing discriminatory about Dresdner assigning Seltzer to work for one of the four positions she was qualified for in July 2000. *See Layaou v. Xerox Corp.*, 999 F.Supp. 426, 433 (W.D.N.Y.1998). Accordingly, I conclude that no reasonable jury could draw any inference of discrimination from Dresdner's failure to assign Seltzer to work for Lambert, Rosen, or Reichstetter.[5]

Third, Dresdner offered the position with Tuchman to a temporary employee in May/June 2000 before offering it to plaintiff in July 2000. (Seltzer Dep. at 53, 151). This fact also fails to support plaintiff's claim. Again, Seltzer continued to work for Seegal until July 15, 2000, and then she moved immediately into her new position

**5.** Seltzer separately alleges that Rosen discriminated against her based on her age because (1) he did not want her to work for him because they were "stylistically incompatible," and (2) Rosen requested that Seltzer not be assigned to the desk outside his office. (*Id.* at 69, 189). When pressed as to why this is evidence of discrimination, Seltzer stated: "call it women's gut instinct." (Seltzer Dep. at 189). She later admitted that there was an entirely different reason for her seat assignment and that she had "no proof" that Rosen's actions were discriminatory. (*Id.*). As Seltzer's allegations are wholly conclusory and speculative, no reasonable jury could find that Dresdner discriminated against Seltzer based on these claims, or that Rosen's actions support the claim of discriminatory discharge. *See Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (" 'Purely conclusory allegations of discrimination, absent any concrete particulars' are insufficient" to satisfy employee's burden on a motion for summary judgment.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

with Tuchman, as soon as she was available. Seltzer suffered no adverse action as a result of the purported delay in assigning her to Tuchman. (Seltzer Dep. at 71–73). *See Galabya*, 202 F.3d at 640.

■ Fourth, Tuchman showed "ageist mentality" and commented to plaintiff in Spring 2001 that "if you were twenty years younger and blonde and beautiful, you'd get [a bracelet]." (Seltzer Dep. at 46). This isolated comment, standing alone, does not show that Dresdner fired plaintiff because of her age. *See Campbell*, 107 F.Supp.2d at 247. The remoteness of the remark, the fact that it was made by a non-supervisor, and the words themselves, support the conclusion that this remark does not evidence age discrimination by Dresdner in its decision to discharge Seltzer. *See Campbell*, 107 F.Supp.2d at 247 (derogatory comment remote in time to termination not enough to defeat a motion for summary judgment); *Burrell v. Bentsen*, No. 91 Civ. 2654, 1993 WL 535076, at *10 (S.D.N.Y. Dec.21, 1993) (derogatory comment made by non-decision maker not connected to plaintiff's discharge falls into "stray remark" category); *Minton*, 160 F.Supp.2d at 694 (same). In addition, even if this comment could be considered as betraying an ageist disposition, it is a classic stray remark and is not sufficient to defeat summary judgment. *See Danzer*, 151 F.3d at 56 (noting that a stray comment, without more, "cannot get a discrimination case to a jury"). All the other undisputed evidence concerning Seltzer's relationship with Tuchman is positive, including his performance review of Seltzer and Seltzer's deposition testimony about their working relationship. (*See* Seltzer Dep. at 77–78; Gold Aff. Ex. A). Seltzer testified that she enjoyed working for Tuchman and would have preferred to stay with him rather than returning to work for Seegal the following year. (Seltzer Dep. at 77–78). No reasonable jury could conclude that the comment made by Tuchman in Spring 2001 had anything to do with Seltzer's dismissal in September 2002.

Finally, plaintiff was dismissed and not offered a position with Short or Markby following Seegal's departure from Dresdner in August 2002. (Seltzer Aff. ¶¶ 31, 32). These facts also fail to support the claim of discrimination because Short herself was laid off. Markby was assigned an administrative assistant, not an executive assistant, and the position was filled by a floater who had already been working for him.

In the end, the only probative, admissible evidence of age discrimination offered by Seltzer is that she was 72 years old when she was discharged. (*Id.* ¶ 32).

### b. *Defendant's Evidence*

Defendant offers the following evidence in support of its motion for summary judgment:

■ First, Dresdner hired Seltzer when she was 64 years old, and assigned her a new position at the age of 70 when Seegal transferred to San Francisco. (Soto Aff. ¶¶ 3, 8, 18). These undisputed facts strongly undercut the claim of discrimination. *See Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir.1997) (noting the difficulty in inferring bias where the actor who made the adverse employment decision against plaintiff also made a recent favorable employment decision regarding plaintiff). This evidence supports a "strong inference" that "discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) *cited in Grady*, 130 F.3d at 560.

Second, at the time of Seltzer's dismissal, there were no available executive assistant positions. (*Id.* ¶ 11). Plaintiff has not presented any evidence otherwise.

Third, Seltzer was discharged because Seegal left the firm. (*Id.*). Other executive assistants were similarly discharged during Dresdner's restructuring if their executive left the firm. (*Id.*).

Fourth, there was not a position available with Short because she was let go the same day as Seltzer, September 18, 2002. (Soto Reply Aff. ¶ 2).

Fifth, the position with Markby was not similar to Seltzer's current position, as it was an administrative assistant position. (*Id.* ¶ 3). Also, Dresdner did not hire anyone for the Markby position; the floater who had been working for him simply remained in the position. (*Id.*).

### c.  The Record As a Whole

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that no reasonable jury could find that plaintiff's age was a factor in her dismissal.

The only admissible, probative evidence of age discrimination is the bare fact that plaintiff was 72 years old when she was discharged. By itself, this evidence is not enough to defeat summary judgment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 517, 113 S.Ct. 2742 (holding that in a discrimination case, plaintiff must prove that firing was a result of intentional discrimination); *James*, 233 F.3d at 157; *Pullin v. Potter*, No. 01 Civ. 2641(DC), 2003 WL 1907203, at *4 (S.D.N.Y. Apr.18, 2003) (granting summary judgment when plaintiff's only evidence in support of age discrimination was "the mere fact that he was in the protected age category").

In contrast, Dresdner has presented overwhelming evidence that plaintiff was not discriminated against because of her age. She was hired at age 64. (Seltzer Dep. at 1, 17). After Seegal moved to San Francisco, plaintiff was moved into another executive assistant position, at age 70.

(*Id.* at 71–72). When Seegal returned to New York, she was assigned back to work with him. (Seltzer Dep. at 77–78).

Moreover, a reasonable jury could only conclude that Seltzer was discharged as part of a company-wide restructuring. (*See* Soto Aff. ¶¶ 2, 13). *See James*, 233 F.3d at 152 (affirming based in part on the evidence that the company was engaged in a bona fide reduction in work force). If an executive left Dresdner during the restructuring, then that executive's assistant was laid off. (*Id.* ¶ 13). Seltzer's own deposition testimony supports this. Seltzer admitted that if she had remained with Tuchman, she would not have been fired (because neither Tuchman nor his assistant was fired or resigned during Dresdner's restructuring). (Seltzer Dep. at 116). Thus, even Seltzer essentially concedes that her dismissal was a result of Seegal's departure and the elimination of her position. Seltzer was fired only when Seegal left Dresdner and hundreds of other Dresdner employees were laid off (approximately 129 on the same day plaintiff was laid off, and a total of 352 employees were let go in 2002 overall).

Seltzer's deposition testimony about her initial reaction to pursuing legal action against Dresdner for age discrimination sums up her claims:

Q:  So you thought it was a silly idea when [Seegal] said—

A:  Absolutely.

Q:  —sue the company?

A:  You can tell.

Q:  Right. And this was even after the comment Mr. Tuchman made months before; correct?

A:  Absolutely.

Q:  And this was even after all those positions that you said you didn't get back in 2000, you still thought it was a silly idea to sue the company; correct?

A: Definitely.

(Seltzer Dep. at 96).

Hence, sufficient evidence does not exist for a jury to find that defendant terminated plaintiff's employment on the basis of age. Rather, the evidence demonstrates that plaintiff was discharged as a result of a company-wide restructuring and because the executive she worked for left the company. Dresdner's motion for summary judgment dismissing the federal and state claims alleging unlawful dismissal is granted.

## C. *Wage and Hour Claims*

### 1. *Applicable Law*

The FLSA sets minimum requirements for wage and overtime payments and prohibits employment for more than a specified number of hours per week without proper overtime compensation. 29 U.S.C. §§ 201–13; *see also* 29 C.F.R. § 785.5. Certain employees, however, are exempt: "Minimum wage and maximum hour requirements . . . shall not apply with respect to . . . any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1).

An "administrative" employee is defined under the C.F.R. as one:

Whose primary duty consists of either: (1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers . . .

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity . . .

Who is compensated for his services on a salary or fee basis at a rate of not less than $250 per week.

29 C.F.R. § 541.2.[6] Discretion and independent judgment "must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.202(b).

■ In defining types of exempt "administrative" employees, the C.F.R. explains that

The first type is the assistant to a proprietor or to an executive or administrative employee. . . . [T]here have been a steady and increasing use of persons who assist an executive in the performance of his duties without themselves having executive authority. Typical titles of persons in this group are *executive assistant to the president,* confidential assistant, executive secretary. . . . Generally speaking, such assistants are found in large establishments where the official assisted has duties of such scope and which require so much attention that the work of personal scrutiny, correspondence, and interviews must be delegated.

*Id.* § 541.201(a)(1) (emphasis added). An employee is exempt under the administrative exemption if the two steps under the FLSA are satisfied: the salary-basis test and the duties test. *See* 29 C.F.R. § 541.1; *Kelly v. City of Mount Vernon,* 162 F.3d 765, 766 (2d Cir.1998). Exemptions to the FLSA are narrowly construed against the employer and the burden of establishing their applicability is upon the employer. *Moreau v. Klevenhagen,* 508 U.S. 22, 32, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993); *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 215 (N.D.N.Y.2002).[7]

---

**6.** References are to the C.F.R. at the time of plaintiff's claims, and not to the regulations as amended in 2004. *See* 69 Fed.Reg. 22,260 (Apr. 23, 2004).

**7.** Claims for violations of the FLSA must be

## 2. *Application*

■ Although some of Seltzer's day-to-day duties are disputed, I conclude that based on what is not in dispute and viewing all of the disputed evidence in light most favorable to plaintiff, no reasonable jury could find that Seltzer was entitled to overtime compensation.

The first part of the two-step analysis, the salary-basis test, is clearly met. Seltzer's base salary at the time of her dismissal was $90,000, and her bonus in 2001 was $30,000. (Soto Aff. Ex. D). Not including bonus, Seltzer made approximately $1,730 per week in 2001. If Seltzer's $30,000 bonus is included, her weekly salary in 2001 would have been approximately $2,307. (Soto Aff. Ex. D). Thus, Seltzer surpasses the $250 threshold required under the C.F.R. in 2001 by almost ten-fold.

The second part of the analysis, the duties test, is also met, as a matter of law. A reasonable jury could only conclude that Seltzer exercised discretion and independent judgment to such an extent that she was exempt. 29 C.F.R. § 541.207. The analysis does not involve a particular formula, but rather, the test "must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.207(b). *See Lott v. Howard Wilson Chrysler–Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir.2000) (finding that "flexibility is appropriate when applying this rule").

First, Seltzer was paid a salary commensurate with her level of responsibility. Seltzer's salary was significantly higher than other non-exempt assistants who did not work for senior executives for Dres-

dner. Seltzer's total compensation in 1999 was $114,305.68, while a non-exempt assistant who worked with Seltzer for Seegal was paid $68,701.52, including overtime, for that same year. (*See* Soto Aff. ¶ 4). *See Donovan v. Burger King Corp.*, 675 F.2d 516, 522 (2d Cir.1982) (holding that assistant managers were exempt under the executive exemption because, *inter alia*, even "taking their longer hours into account" the exempt employees were "paid substantially higher wages"); *Lott*, 203 F.3d at 331 (holding that "comparative wages" is part of the analysis to determine whether an employee qualifies under the administrative exemption). In addition to salary, exempt assistants received an additional week vacation and unlimited sick time. (Soto Aff. ¶ 4, Ex. C). These benefits were not offered to non-exempt assistants. (Soto Aff. ¶ 4). *See* 29 C.F.R. § 541.103 (considering the salary of the exempt employee compared with non-exempt employees to determine whether the executive exemption applies).

Second, Seltzer worked for the president of Dresdner, a large company with hundreds of employees.[8] This is precisely the type of position contemplated by the C.F.R. as being covered by the exemption. *See id.* § 541.201(a)(1).

Third, the record shows that Seltzer exercised discretion and independent judgment. For example, Seltzer wrote that she spent "weeks" preparing for Seegal's return to New York from San Francisco in 2001, "making the effort to catch up on a year's worth of activities that [she] wasn't privy to." (Malanga Casey Aff. Ex. F). Seltzer also testified that she was respon-

---

brought within two years, except that the statute of limitations is extended to three years for willful violations. 29 U.S.C. § 255(a). *See Pollis v. New School for Social Research*, 132 F.3d 115, 119 (2d Cir.1997); *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 322 (S.D.N.Y.2001).

**8.** The record does not reflect the total number of employees who worked at Dresdner during Seltzer's tenure. Given, however, that 352 Dresdner employees were dismissed in 2002 alone, at the very least it employed "hundreds" of employees. (*See* Soto Aff. ¶ 2).

sible for Seegal's personal checking account, and exercised discretion when putting calls through to Seegal or interrupting him as required. (*Id.;* Seltzer Dep. at 17; Seltzer Aff. ¶ 8). Seltzer described her duties for Seegal as "anything that most executives of that level require from an assistant." (Seltzer Dep. at 17). She worked with the heads of many Fortune 500 companies. (Malanga Casey Aff. Ex. F). When Seegal transferred to San Francisco, he asked Seltzer to transfer with him.[9] (Seltzer Dep. at 26). Seltzer declined his offer, but Dresdner still sent her to San Francisco for two weeks to assist Seegal when he transferred from New York. (*Id.* at 35). When Seegal returned to New York the following year, he arranged with Tuchman so that Seltzer would again work for him. (*Id.* at 55).

Fourth, the evidence shows that Seltzer was the "lead assistant" for Seegal. (*Id.* at 19–26; Malanga Casey Aff. Ex. H). The other assistants covered the telephones when Seltzer was not at her desk and in off-hours when Seltzer was out of the office. (Seltzer Dep. at 19–26). Some of these assistants only worked with Seegal and Seltzer. (*Id.* at 22). Of these assistants, it is not in dispute that Seltzer was the primary executive assistant. (*Id.* at 22–25). The others were either temporary assistants hired to assist Seltzer, or they were shared with other executives. (*Id.*). Seltzer was Seegal's "main assistant." (*Id.* at 25; Malanga Casey Aff. Ex. G (Seltzer describing "a temp working under me as my back-up")). Further evidencing her influence, Seltzer wrote it was at her "suggestion that [Dresdner] hire[d] [a temp] as a permanent person." (Malanga Casey Aff. Ex. G).

Fifth, Dresdner had procedures and policies in place whereby certain assistants were classified as exempt and certain were classified as non-exempt. This classification was not based on title or age. (*Id.* ¶ 5). It was based on experience, job responsibility, and salary. (*Id.* Exs. D, G (Seltzer distinguishing herself from another non-exempt executive assistant because of their respective duties)).

The record is clear that Seltzer made herself indispensable to Dresdner and its president, and Dresdner, for its part, was willing to compensate her accordingly. The FLSA is intended to help employees who have little or no bargaining power and who need protection against oppressive work hours. *See* S.Rep. No. 884, 75th Cong., 1st Sess. 39 (1937). It was not intended to help someone in plaintiff's position—a person earning some $120,000 a year as executive assistant to the president of a substantial investment banking firm.

I hold that no reasonable jury could conclude that Seltzer was entitled to overtime compensation or that Dresdner, by classifying Seltzer as an exempt employee, violated the FLSA.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment in favor of defendant dismissing the complaint, with prejudice.

SO ORDERED.

---

**9.** At the time of Seltzer's deposition, she had worked for Seegal for approximately fourteen years. Approximately six years at Salomon Brothers, seven years at Dresdner, and one and a half years at Stephens Financial Group. (*See* Seltzer Dep. at 6–8, 12–13).